808 So.2d 145 (2002)
Dolan DARLING, Appellant,
v.
STATE of Florida, Appellee.
No. SC94691.
Supreme Court of Florida.
January 3, 2002.
Rehearing Denied February 12, 2002.
*148 James B. Gibson, Public Defender, and Christopher S. Quarles, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Judy Taylor Rush, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

MATERIAL FACTS
The victim in this case, Grazyna Mlynarczyk ("Grace"), was a thirty-three-year-old Polish female living illegally in the United States. The State's first witness, Zdzislaw Raminski (known as "Jesse"), had met the victim in Poland in 1990 or 1991. Grace and Jesse developed a personal relationship, which continued when Grace moved to Orlando on September 28, 1992.
Jesse owned and operated Able Transportation, which provided shuttle service to and from the airport, and Grace was employed part-time with this enterprise. The last time Jesse saw Grace alive was on the morning of October 29, 1996, at around 9:30. At that time she was wearing shorts and a small shirt, as she was doing laundry in a facility at her apartment complex. Jesse did not exit his vehicle when talking with Grace only briefly that morning. She told Jesse that she had an appointment with a gynecologist later that day. Jesse gave Grace an AmSouth Bank envelope containing three hundred dollars cash in payment for work she had performed for the company during the prior week. Jesse drove away from the apartment complex and proceeded to work. Jesse again spoke with Grace around 10:15 a.m. by phone, and she indicated that she was still doing laundry, and would call him after she returned from her doctor's appointment. Although *149 Jesse continued to telephone Grace throughout the day, he was unable to reach her again. Around 4:10 p.m., Jesse called again and was still unable to reach Grace. He became concerned that she had not telephoned him after her doctor's appointment, so he returned to her apartment complex.
Upon arriving there, he was surprised to find that the blinds to Grace's apartment which she never closed during the day-time were closed. He used his key to enter the apartment, where he found a basket with laundry in the living room, and the door to the bedroom closed. He recalled seeing no disturbed objects in the apartment. Upon entering the bedroom, however, he found Grace. She was on her back on the floor, naked from the waist down, with her face near the bed and her legs inside the closet. When she did not respond to him, Jesse moved Grace to the bed, and discovered that she was cold, and had blood on her. He proceeded to call 911 for assistance and members of the fire department arrived shortly thereafter. They soon determined that Grace was dead.
Officers from the Orange County Sheriffs Office responded to the scene and secured items of evidence found in the bathroom, which included a lotion bottle, a pair of panties, and a pink throw pillow. The pillow had a blackened area and a gunshot hole through the sides. There was blood spatter on the door of the closet, and blood present in the closet area. Two AmSouth Bank envelopes were found which contained cash totaling approximately twelve hundred dollars and a shoe box was discovered which contained one thousand dollars. There was also a wallet which held fifty-eight dollars. Jewelry located in boxes appeared to be undisturbed.
An officer who had canvassed Grace's neighborhood to determine whether there were witnesses with information regarding the murder testified that he had contacted Darling on October 30, the day after the murder. Darling's apartment was located just north of Grace's apartment. In response to the investigating officer's inquiry, Darling had said that "he was working and didn't know anything of the incident."
Dr. William Robert Anderson of the Orlando Medical Examiner's Office testified at trial. His testimony included a discussion concerning the "defect" in the pillow, particularly the "cloud of soot" from the "burning gun powder" left on the pillow as the "bullet comes out." The gun was fired at close range because he observed "in the victim only a small amount of soot material. But ... on the pillow there is a significant amount of that soot material." Dr. Anderson indicated that "the end of the weapon was up against that pillow ... fairly tightly." He also testified that the "defect in the middle is consistent with a bullet passing through ..., creating a tear." When the doctor first saw Grace, "[r]igor mortis was complete," and he estimated that she "was probably dead at least six hours from the time we saw her, which was about seven."
Dr. Anderson testified that the bullet entered "the right back of the head." Grace had an abrasion there "consistent with something having been up against the cloth transferring energy across to the skin and creating that." "That pillow" was consistent with the abrasion. The doctor found that Grace had "some vaginal injuries, but nothing that would make her bleed significantly." There was "[a] lot of bleeding ... inside the brain," but "she's gonna die pretty quick." He stated that "[c]onsciousness would probably not be more than a few seconds," and that "[s]he would have no motor activity" or any "ability to move anything at that point." The doctor stated that "the rapidity [with] *150 which she dies" is "one of the reasons she probably didn't bleed."
The doctor stated that there was "seminal purulent" in Grace's vaginal area and bruising on the "back of the elbows ... consistent with some moving around." There was "a hemorrhage," which "means that took place when circulation was alive." The vaginal area abrasions were "consistent with vaginal trauma from penetration of some object, penial, digital, some other object." The doctor pointed out that the "tear of the labia majora, which is a very sensitive area" was "quite painful," adding: "This would not be consistent with consensual sex, in that the pain would interrupt the activity. It would be painful enough that consensual sex would not apply after that point." The doctor observed that "there wasn't anything in the labia that would explain those abrasions other than trauma."[1] The victim's "rectal area" had "some tears," which were caused by "[d]igital penetration, penial penetration, some trauma." The doctor opined that this, too, was painful. He further indicated that the "gunshot wound to the head with the injuries... described" was the cause of Grace's death.
Photographs and records of fingerprints found in Grace's apartment were developed and submitted to a comparison expert. A photograph of fingerprints from the lotion bottle was developed, and admitted into evidence as Exhibit 14. At trial, the State's expert in the detection, enhancement, and recording of fingerprints opined that the fingerprint on the lotion bottle had been there for less than one year. The State's expert in the area of fingerprint comparison compared the fingerprints on Exhibit 14 with fingerprints obtained from Darling. He testified at trial that he found a print on the lotion bottle which matched that of Darling's right thumb.
The State's expert in the area of forensic serology tested vaginal swabs and a rectal smear which were taken from the victim's body, and found semen on them. A stain card containing Darling's blood which had been prepared for examination and comparison was admitted into evidence at trial without objection.
David Baer, a Senior Crime Laboratory Analyst in the DNA Section of the Florida Department of Law Enforcement (FDLE) Orlando Crime Laboratory, also testified as an expert at trial. He indicated that he had been with FDLE for some nineteen years. He had begun doing DNA work in the laboratory upon its inception in 1991, and had continued to work there until the date of trial. Upon Baer's being tendered as an expert by the State, defense counsel objected on the basis that "this witness hasn't indicated any qualification in the area of statistical analysis."
Baer stated that, although he did not "claim to be a statistician," he was "familiar with how statistics are used in this instance." He indicated that he relied on the expertise of other statisticians in reaching his expert opinion. However, he also indicated that he had been qualified to render an expert opinion in the area of statistical interpretation of DNA tests "just about any time I testify on DNA," having never been denied expert qualification in that area. He stated that he had been qualified as an expert in the performance and interpretation of DNA allowances in Florida courts "fifty to sixty times." His training in the area of DNA statistical analysis included completion of a *151 160 hour course which included "about sixteen hours in statistics"; in addition, he had been educated in statistics in several "other short courses," including a statistics workshop in 1995.
Baer testified that he used the modified ceiling principal formula, which is a variation of the product rule recommended by the National Research Council[2] in its 1992 Report. He acknowledged that there are "issues about the genetic variation between different populations," and to compensate for that, he did three calculations in Darling's case. Each calculation utilized a different database: one was based on African-American data,[3] one was based on Caucasian data, and one was based on Southeastern Hispanics from the Miami area, where there are racial differences in DNA types. In Baer's opinion, use of the ceiling principal compensated for any differences within the major ethnic groups, which he stated are regarded as "very insignificant," in any event.[4]
Baer testified that "[t]here is no one formula for a sample size" for a DNA database. The Caucasian database used by Baer was one which he and FDLE had produced in the Orlando laboratory.[5] He used the FBI's African-American[6] and *152 Hispanic[7] databases. Baer testified that the formula used by FDLE when "we do the modified ceiling calculations ... gives a ninety-five percent upper confidence level."
After conducting voir dire of Baer, defense counsel objected to "the witness being qualified to discuss analysis as an expert in that field." The trial judge found Baer qualified to testify as an expert in DNA analysis, stating (outside the presence of the jury):
I find the witness is qualified to conduct laboratory analysis stipulated by both parties and qualified in the application of the statistical formulas developed by others. Although not a statistician himself he is sufficiently trained and qualified to use those formulas much as a person might make certain calculations using algebraic formulas might not be qualified to testify as to the fundamental mathematics underlying development of those formulas. He's not required to be a statistician himself in order to use those formulas.
Baer then testified regarding the DNA examination which he had performed on Darling's blood and the vaginal swabs containing sperm. He stated that the test performed on the subject semen sample was one which had been used consistently for the past nine years. As a result of the testing, Baer concluded that the DNA from Darling's blood sample had both a strong band and a weak band which matched the male fraction found on the vaginal swabs containing sperm from Grace's vagina. Baer explained that a statistical analysis was performed using the resultant data: "Once I determin[e] that a profile does match I'll then do a statistical interpretation of the profile to determine how common would this profile be in the general population." In this case, after finding ten independent genetic markers, Baer determined the frequency of each of them.
Baer stated that he had computed numbers that varied depending upon which of the different databases were used. Based upon the Caucasian database, and using the product rule with the plus or minus 1.735 bin window, Darling's DNA profile would have a frequency of about one out of 239 billion. Using the modified ceiling method, with "the larger match window," the match frequency would be "one out of ninety-nine billion Caucasians."
Applying the product rule with the plus or minus 1.735 bin window to the FBI's African-American population database, Darling's DNA profile would have a frequency of "one out of 104 billion" African-Americans. Using the modified ceiling method, with "the larger match window," the match frequency would be one out of 101 billion African-Americans.
Using the California Hispanic database, and the product rule with the plus or minus 1.735 bin window, Darling's DNA profile would have a frequency of "one out of 1.7 billion, eighty-one Hispanics." Using the modified ceiling method, with "the larger match window," the match frequency would be one out of 1.3 trillion Hispanics.
*153 At the close of the State's case, Darling did not testify, and offered no evidence. The jury was instructed and, after deliberating, found Darling guilty of capital murder and armed sexual battery.
During the penalty phase proceeding, the State presented evidence of a prior violent felony conviction. Gerald Paul Daigneault, a self-employed taxicab driver, testified that he had been robbed at gun-point by Darling after having picked him up as a passenger. Daigneault stated that, although he had complied with Darling's demands, when he turned to give Darling his money, he was shot in the back of the head. The bullet shattered Daigneault's jaw, destroying his eardrum and part of his gum. Daigneault survived by opening the car door, rolling out, and "playing dead" until Darling drove off. Darling's conviction and sentence for these crimes were entered into evidence without objection. After Daigneault testified, victim impact evidence was also presented.
Darling then presented four penalty phase witnesses. Bahamian Deshane Claer testified that Darling was the father of her three-year-old daughter, Divinka. Claer stated that Darling had provided emotional support during her pregnancy, although she had no contact with Darling from the time she first learned she was pregnant until four or five months later. Shortly thereafter, Divinka was born, and, the next month, Darling left for the United States. Claer stated that Darling had maintained contact with her, sending Christmas, birthday, and Valentine's cards and other communications to her and their daughter, about whom he expressed concern.
Darling's sister Verneki Butler, a computer teacher in the Bahamas, also testified. Butler stated that her parents, although not married, had lived together, and were both employed outside the home. The children had plenty of food, good clothes, and other necessary provisions while growing up, and they attended church. Her father was considered "a good hard-working citizen and a success," who supported his family well, and helped Butler to go to college.
However, Butler stated that she had suffered extreme emotional difficulties related to her father, in part, because of embarrassment arising from his many extramarital affairs. Butler also testified that her father was "very verbally abusive" to her, and that he was verbally, emotionally, and physically abusive to her mother and Darling. She stated that the abuse directed to her mother had started a little before she left home to go to college (at age sixteen), and that most of it occurred while she was gone. However, she had heard reports from her mother and, upon returning home after graduation from college, she "saw it again." The worst incident she ever witnessed was when Darling was beaten with a P.V.C. pipe because he had missed a meeting with his probation officer.[8] In another incident, Darling was beaten because their father had to wait for him. At other times, Darling was beaten when "he tried to separate a fight" between his parents. Butler did not think that Darling was like their father, because "[t]o me he shows more love."
Darling's mother, Eleanor Bessie Smith, testified. She stated that Darling's father, Carlton, had provided for the children, and the two of them had built the family's middle class home together. Smith stated that Carlton's alcoholism "was a problem" in the home. She stated that Carlton "was abusive with [her]" and was verbally abusive toward Verneki "when he drinks." *154 After Darling began college, his father "never cared for him at all," and Darling complained that he wanted Carlton to "show some interest in him, not just to put food on the table." Smith said that, on many occasions, Darling would try to defend her from Carlton, and would receive "bruises" as a result. Smith believed that Carlton's relationships with other women were embarrassing for Darling. She had brought Darling up to believe in God, and she related that Darling had kept in touch and demonstrated concern for her while he was in jail.
Darling's last witness was Dr. Michael Herkov, who was accepted without objection as an expert in forensic psychology. Dr. Herkov did a clinical interview with Darling, reviewed some of the discovery provided by the State, and evaluated Darling. He also consulted with investigators, interviewed family members, and read Carlton's deposition. Carlton indicated that his relationship with Darling had deteriorated because "as he entered the teen years he got in trouble and was difficult to discipline." Darling's family members described him to Dr. Herkov as "a very good person, very polite, very non-violent, loving to his children, and a good domestic partner, caring, et cetera, et cetera." However, Dr. Herkov testified that it was quite possible that Darling appeared one way to family members and was still capable of committing murder. Dr. Herkov also read the statement of Harlan Deen (a headmaster at one of the Bahamian schools Darling attended), and spoke with Darling's probation officer, Debra Rolle. Deen had reported to Dr. Herkov that Darling (whom Deen described as a "bully") could "appear to be very compliant and cooperative and friendly and then do a lot of things that were inconsistent with that."
Dr. Herkov indicated that Darling's I.Q. of 84 was "about a middle low average range," and that there was "some evidence to suggest a learning disability," but "no diagnosis." Dr. Herkov said that Darling's "problems in school" were "certainly consistent with somebody who's been abused." Dr. Herkov said that physically abused children "are much more likely to get in trouble with the legal system, to have crimes that are violent," and to engage in "antisocial" behaviors. Nonetheless, Dr. Herkov opined that, knowing everything that had happened to Darling as a child, he could not "at all" say that it excused his behavior in this case, nor did Dr. Herkov conclude that the abuse could lead Darling to do something that he did not know he was doing.
At the close of the penalty phase evidence, the jury retired to deliberate its sentencing recommendation,[9] following which, they recommended a death sentence by eleven to one. After conducting a hearing pursuant to Spencer v. State, 615 So.2d 688 (Fla.1993), the trial judge found two aggravating factors, the statutory age mitigator, and several nonstatutory mitigators. He rejected as mitigators the fact that Darling is a human being, and residual doubt. After assigning appropriate weight to the mitigation and considering all factors bearing on the sentencing decision, the trial court found that "the aggravating circumstances outweigh the mitigating circumstances present." Following the jury recommendation, he imposed the death sentence for the capital murder, and *155 sentenced Darling to 256.5 months for the armed sexual battery. Darling raises eleven points on appeal.[10] We turn first to the appellant's claims concerning the guilt phase of the trial.

APPEAL

Denial of Motion for Judgment of Acquittal
Darling argues that the trial court erred in denying his motion for judgment of acquittal because the State's evidence, which is wholly circumstantial, failed to exclude the reasonable hypothesis that someone other than Darling killed the victim, or that the killing was not premeditated. Darling also argues that the State's evidence was legally insufficient to support a guilty verdict for sexual battery.
In moving for a judgment of acquittal, a defendant "admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." Lynch v. State, 293 So.2d 44, 45 (Fla.1974). As explained in Lynch:
The courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law. Where there is room for a difference of opinion between reasonable men as to the proof of facts from which the ultimate fact is sought to be established, or where there is room for such differences as to the inference which might be drawn from conceded facts, the Court should submit the case to the jury for their finding, as it is their conclusion, in such cases, that should prevail and not primarily the views of the judge. The credibility and probative force of conflicting testimony should not be determined on a motion for judgment of acquittal.
Id.
However, where a conviction is based wholly upon circumstantial evidence, a special standard of review applies. See Jaramillo v. State, 417 So.2d 257 (Fla. 1982). As stated in State v. Law, 559 So.2d 187 (Fla.1989):
Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
. . . .
... A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present *156 evidence from which the jury can exclude every reasonable hypothesis except that of guilt. Consistent with the standard set forth in Lynch, if the state does not offer evidence which is inconsistent with the defendant's hypothesis, "the evidence [would be] such that no view which the jury may lawfully take of it favorable to the [state] can be sustained under the law." 293 So.2d at 45. The state's evidence would be as a matter of law "insufficient to warrant a conviction." Fla. R.Crim. P. 3.380.
It is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
Id. at 188-89 (citations and footnote omitted).
In this case, Darling's theory of innocence was that he had a consensual sexual encounter with the victim sometime prior to her death, after which she was killed by someone else (possibly one of the maintenance men at the apartment complex in which she lived, or her Polish husband, or her boyfriend Jesse). However, there is no record evidence to support such a consensual sexual encounter with the victim. First, the medical examiner was unequivocal in testifying that the abrasions in the victim's vaginal area were evidence of forcible sex. While he stated that the injuries could be indicative of "very violent sex," he also testified that, given the nature of the vaginal abrasions, the encounter would be so painful that any continuation of the act beyond that point would not be consensual. Further, Darling's theory that the victim scratched herself because of her cervical inflammation was also inconsistent with the medical examiner's testimony, indicating both that, anatomically, the cervical inflammation would not cause vaginal itching, and that the abrasions were several layers deep; thus, it would be very painful to inflict them.
Second, the existence of a "relationship" between Darling and the victim is not supported by the testimony of the witnesses. Jesse stated that Grace was his girlfriend, and that he was not aware that she had a relationship with anyone else. Further, the detective who canvassed the neighborhood stated that Darling told him he was at work during the time frame of the incident, and knew nothing about it. While Darling argues that he never denied knowing Grace, this is not a reasonable conclusion, given this officer's testimony. Because the State presented competent, substantial evidence which is inconsistent with Darling's theory that he had a consensual sexual relationship with the victim, and that someone else murdered her afterwards, the trial court did not err in denying Darling's motion for judgment of acquittal. See generally Law, 559 So.2d at 188-89.

Competent, Substantial Evidence to Support the Verdict
Having determined that the record contains competent, substantial evidence which is inconsistent with Darling's theory of innocence as argued at trial, we must next determine whether there is competent, substantial evidence to support the jury's verdict. See Beasley v. State, 774 *157 So.2d 649, 657 (Fla.2000) (citing Law, 559 So.2d at 188 (observing that "[t]he question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse")). Here, such record evidence does exist.
Initially, Darling argues that the semen evidence is not conclusive, because the length of time that the semen was present in the victim's body was not established. Because the record evidence does not support a theory that Darling engaged in a consensual sexual encounter with the victim sometime prior to her death, this argument is unpersuasive. Additionally, Darling challenges the fingerprint evidence as insufficient to support his conviction. However, this argument, which is premised on Darling's position that the otherwise compelling DNA evidence is "unreliable," overlooks important distinctions between this case and the cases relied upon by the appellant, Jaramillo v. State, 417 So.2d 257 (Fla.1982) and Shores v. State, 756 So.2d 114 (Fla. 4th DCA 2000).
In Jaramillo and Shores, the only evidence linking the defendants to the crimes was fingerprint evidence appearing on items for which there was another reasonable hypothesis presented by the defense. In Jaramillo, the defendant himself testified, providing an explanation for his fingerprints on a kitchen knife and on a grocery bag located next to a chair in the dining room. Significantly, although latent prints were discovered in areas where the house had been ransacked and on the handcuffs with which one of the two victims (each shot in the head three times) had been bound, none of these prints belonged to Jaramillo. Here, in contrast, the State did not rely solely upon the fingerprint evidence on the lotion bottle to establish Darling's presence in the apartment at the time of the murder; it also presented compelling evidence that the victim had been forcibly raped, coupled with equally strong DNA evidence of semen taken from the victim's vagina which matched Darling's DNA profile with respect to ten independent genetic markers.
In Shores, similarly, the only evidence linking the suspect to the burglary was a fingerprint on a box of ammunition in a drawer which had been ransacked by the burglar. There, the appellate court observed that, where fingerprints are found on an object which is accessible to the public, such evidence, standing alone, will be insufficient to sustain a conviction. 756 So.2d at 116. Here, however, the fingerprint evidence was presented in addition to other compelling evidence that Darling was the perpetrator of the victim's sexual assault and murder. Thus, both Jaramillo and Shores are inapposite.
Lastly, Darling's argument that the evidence does not support a finding of premeditation is unconvincing. On this record, the jury could reasonably conclude that the victim, after being forcibly raped, was shot, execution-style, by a gunshot wound purposefully inflicted by placing the gun tightly against a throw pillow held directly next to the victim's head. This Court has upheld findings of premeditation in other cases involving execution-style killings. See Bruno v. State, 574 So.2d 76, 82 (Fla.1991) (observingafter making the initial observation that, from the evidence presented, it was shown that the defendant first "administer[ed] his savage beating which rendered the victim helpless," and then "shot the victim twice in the head at point blank range through a pillow"that, as noted by the judge in his sentencing order, "[t]his was especially cold, calculated and premeditated. It was essentially *158 an execution."); Parker v. State, 456 So.2d 436, 444 (Fla.1984) (upholding a finding that the murder was cold, calculated, and premeditated, where the evidence showed that the "victim had been pleading with defendant not to harm his girl friend and, at the time he was murdered, was lying naked, face down, on a bed," and that, "[b]efore killing the victim by a gunshot blast into his back, defendant accepted a pillow from his partner in order to muffle the shot"); Lightbourne v. State, 438 So.2d 380, 391 (Fla.1983) (upholding a finding of premeditation where the victim, who, during the course of a burglary, had been forced into acts of oral sex and intercourse as she begged the defendant not to kill her, had been murdered in an "execution-style killing using a pillow placed between the murder weapon and the victim's head"). Here, similarly, there is competent, substantial record evidence to support the jury's verdict that Darling committed premeditated murder and felony murder (based upon sexual battery).

Admission of DNA Evidence
Next, Darling argues that the trial court abused its discretion in allowing Baer to testify as an expert in this case. Specifically, Darling claims that Baer, who was not a statistician, was not qualified to testify regarding the statistical analysis which was conducted, and argues further that, because Darling is Bahamian, a Bahamian database (rather than the FBI's African-American population database) should have been employed here. This Court, in its de novo review of a trial court's Frye determination (described by this Court in Brim as a question of law, 695 So.2d at 274), may examine "`expert testimony, scientific and legal writings, and judicial opinions' to decide whether the scientific principles and procedures relied upon to create such evidence are generally accepted by a relevant scientific community both at the time of trial and today." Brim v. State, 779 So.2d 427, 428 (Fla. 2d DCA 2000) (citing Hadden v. State, 690 So.2d 573, 578 (Fla.1997)).
Applying that test, Darling's challenges to the expert's qualifications and methodology lack merit. As we stated in Brim, "[i]n utilizing the Frye test, the burden is on the proponent of the evidence to prove the general acceptance of both the underlying scientific principle and the testing procedures used to apply that principle to the facts at hand. The trial judge has the sole responsibility to determine this question. The general acceptance under the Frye test must be established by a preponderance of the evidence." 695 So.2d at 272 (alteration in original) (quoting Ramirez v. State, 651 So.2d 1164, 1168 (Fla.1995)).
Here, the expert testified regarding the general acceptance in the scientific community of the methodology used, and demonstrated his knowledge and experience regarding both the methodology and the databases employed. The fact that he was not, himself, a statistician is not a sound basis to exclude his expert testimony regarding the statistical results. Cf. Murray v. State, 692 So.2d 157, 164 (Fla.1997) (observing that "it is not absolutely necessary for an expert witness to demonstrate practical experience in the field in which he will testify"; rather, the expert must "demonstrate a sufficient knowledge of the database grounded in the study of authoritative sources"); Lomax v. State, 727 So.2d 376 (Fla. 5th DCA 1999) (rejecting a claim that the trial court erred in admitting DNA opinion evidence even though the State's expert witnesses did not personally compile the population statistics used in formulating their conclusions); see also Fay v. Mincey, 454 So.2d 587, 595 (Fla. 2d DCA 1984) (observing that it is "well-established *159 that an expert does not need a special degree or certificate in order to be qualified as an expert witness in a specialized area," but "can be qualified by his `experience, skill and independent study of a particular field.'") (quoting Salas v. State, 246 So.2d 621, 623 (Fla. 3d DCA 1971)).
Further, Darling's challenge to the expert's failure to use a Bahamian database[11] (to the extent preserved) also lacks merit. In Government of the Virgin Islands v. Penn, 838 F.Supp. 1054 (D.Vi. 1993), the court addressed a challenge to the FBI's assignment of the bin frequencies derived from the black United States database to the DNA bands of the defendant, a black man from St. Thomas. The defendant "claimed that assigning bin frequencies derived from United States blacks to the DNA profile of the defendant could have produced inaccurate probability calculations that were biased against the defendant." Id. at 1070. In analyzing this issue, the court considered a study entitled "VNTR[12] Population Data, A Worldwide Study," a compilation of data reflecting bin frequencies on population "substructures" around the world. Id. The court noted that Dr. Bruce Budowle, the chief scientist at the FBI's DNA laboratory, had stated that the differences in bin frequencies "do not have forensically significant effects on VNTRs profile frequency estimates when subgroup reference databases from within a major population group are compared." Id. at 1071.[13] Therefore, "the inference on the rarity of the profile would not change with the various estimates." Applying this to the case before it, the court observed that the "obvious implication is that even though a jury will not hear exactly how rare the defendant's DNA profile is in St. Thomas's black population, the jury can infer how rare the defendant's DNA profile would be in a database that reflects that population by hearing how rare the defendant's DNA profile is in the United States black database." It concluded, in light of this phenomenon, that
any concern that the St. Thomas' black population's bin frequencies are drastically different from those of the United States black population is unwarranted. Though the application of the United States black bin frequencies to the defendant's bands does not produce the precise odds of finding a random match in the defendant's population, the danger of error in any such application is so small as to be practically nonexistent. *160 Id.[14] A similar logic applies in this case. Accordingly, the trial court did not err in admitting the DNA evidence here, or in allowing Baer to testify as an expert regarding the DNA testing, data, and resultant statistical analysis.

Other Suspects
Next, Darling argues that the trial court erred in not allowing defense counsel to comment further on the State's failure to exclude other suspects. However, the record reflects that defense counsel did argue, repeatedly, that someone other than Darling could have been the murderer. Therefore, this argument lacks merit.

Limitation of Voir Dire Examination
Darling argues that the trial court erred in limiting defense counsel's questioning regarding capital case issues during voir dire examination of prospective jurors. As stated by the Court in Franqui v. State, 699 So.2d 1312, 1322 (Fla.1997), cert. denied, 523 U.S. 1040, 118 S.Ct. 1337, 140 L.Ed.2d 499 (1998), "[t]he scope of voir dire questioning rests in the sound discretion of the court and will not be interfered with unless that discretion is clearly abused." Based upon the record in this case, the trial court did not abuse its discretion in limiting the scope of questioning during voir dire. Although the judge did not permit questioning about whether the prospective jurors had seen stories about prisoners released from death row, or about whether their "drive" to impose the death penalty would be lessened by the fact that the alternative sentence was life without parole, defense counsel was able to explore the potential jurors' concerns about the length of capital proceedings, and their understanding of the alternative penalties which applied. To the extent that these objections were preserved, no abuse of discretion is shown.

Failure to Give Guilt Phase Circumstantial Evidence Instruction
We similarly find no merit to Darling's argument that the trial court erred in denying his requested special instruction regarding circumstantial evidence. As we observed in Monlyn v. State, 705 So.2d 1 (Fla.1997):
We have in fact expressly approved courts which have exercised their discretion and not given the instruction:
In In re Standard Jury Instructions in Criminal Cases, 431 So.2d 594 (Fla.1981), we found the instruction on circumstantial evidence to be unnecessary and deleted it from the standard instructions. A trial court can, of course, give such an instruction if, in the court's discretion, it finds it necessary due to the particular facts of any case. Williams v. State, 437 So.2d 133 (Fla.1983); Standard Jury Instructions in Criminal Cases. The trial court did not find the circumstantial *161 evidence instruction necessary in this case, and we find no abuse of discretion in his refusal to give such an instruction.
Id. at 5 (quoting Rembert v. State, 445 So.2d 337, 339 (Fla.1984)). We find no abuse of discretion in the trial court's refusal to give the requested instruction.

Rebuttal Closing Argument
Darling argues that the trial court erred in not allowing defense counsel to make a rebuttal closing argument in this case. When defense counsel concluded the initial closing argument, the prosecutor stood before the jury, thanked them, and stated:
I don't feel it's necessary to do a closing argument. We will ask the jury to rely upon the evidence they've heard, the court's instruction on the law. We'd ask the court to proceed to jury instruction.
Defense counsel then attempted to argue in rebuttal, and the prosecutor objected, contending that, according to case law, his statement was not argument, and there was nothing to rebut. The trial court, agreeing with the State, proceeded to instruct the jury on the law.
In reviewing this argument, the case which most clearly applies is Dean v. State, 478 So.2d 38 (Fla.1985). In Dean, the Court found "unconvincing" the petitioner's argument "that he was not allowed to make the concluding argument before the jury as required by Florida Rule of Criminal Procedure 3.250," id. at 44, observing:
The record shows that petitioner's counsel opened final argument. Counsel for the co-defendant followed with his final argument. Upon the conclusion of co-defendant's argument, the prosecutor stood up in open court, before the jury and asserted, "I think I can save the court some time. The evidence speaks for itself. We rest." The trial court concluded that this did not constitute final argument on the part of the state, and the district court affirmed. We agree. In Menard v. State, 427 So.2d 399 (Fla. 4th DCA), cert. denied, 434 So.2d 888 (1983), the fourth district court, when faced with a similar situation, stated:
Every now and again, in the tragic world of criminal appeals, comes a case that brings involuntary smile to otherwise grim lips. This is one of those, though it cannot be expected to afford any amusement to the defendant.
At the end of the initial final argument presented by the defense, the State's entire response was:
The State of Florida is going to rely on the evidence and testimony before the court and juror's common sense, and we will waive our argument.
The defense, discomforted by this tactic, pressed for the right to conclude on the basis that the comment "relying on the evidence and common sense" did not constitute a waiver and actually was final argument. (Cite omitted). We disagree. The remark did [not] address the evidence in particular nor any other testimony. Nor did they dwell unnecessarily on the level of intelligent consideration to be extended by the jury. Moreover, unlike the discourse in Andrews [v. State, 99 Fla. 1350, 129 So. 771 (Fla. 1930)], supra, the comments were but a very few words and in our opinion did not rise to the level of final argument.
427 So.2d at 400.
Similarly, the prosecution's waiver of final argument in the instant case provided no reason for defense counsel's further argument to the jury. Accordingly, *162 we hold there was no error in the instant case.
Dean, 478 So.2d at 44. Here also, the prosecutor merely referred generally to reliance upon the evidence presented and the trial court's instructions, without further comment.[15]
Furthermore, even if preclusion of further closing argument was error here, it has not been shown to be prejudicial. Defense counsel made a contemporaneous proffer, indicating that, had he been given the opportunity to make additional closing comments, he would have questioned whether other persons whose names were mentioned during the State's case in chiefthe maintenance men, Christopher Powell and Jean Marcushad been eliminated as suspects by DNA analysis or other means. However, in defense counsel's initial closing remarks, he had already attempted to direct attention to other potential perpetrators in the case, remarking that "there were 75 unidentified prints," and suggesting that "there's some evidence missing." Later, he admonished the jury to "[r]emember that Raminski told the police that Grace's husband threatened to kill her. Think about the fact that Raminski said Grace was afraid of the maintenance men." Lastly, this particular line of summationthat "there was no evidence that these witnesses, Powell, and Marcus was also mentioned, that their prints were checked," had already been alluded to by the defense in its initial closing statement, when counsel stated: "There are a lot of things that you don't know that are important. Who is Christopher Powell? Why was he a suspect? Where was his DNA?"[16] Therefore, here, as in Dean, even if the trial court erred in precluding further closing argument, such error would be harmless.

Rejection of Residual Doubt as a Mitigator
Darling argues that the trial court erred in refusing to allow defense counsel to present penalty-phase evidence to support an argument that residual doubt could be considered as a mitigator. This Court has followed the holding of the United States Supreme Court that there is no constitutional right to present "lingering doubt" evidence. See Sims v. State, 681 So.2d 1112, 1117 (Fla.1996); Franklin v. Lynaugh, 487 U.S. 164, 173-74, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (rejecting the argument that the Eighth Amendment requires a capital sentencing jury to be instructed that it can consider lingering doubt evidence in mitigation). We have repeatedly observed that residual doubt is not an appropriate mitigating circumstance. See Preston v. State, 607 So.2d 404, 411 (Fla.1992) (rejecting residual doubt as an appropriate mitigator); King v. State, 514 So.2d 354, 358 (Fla.1987) (same), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (1988). Therefore, the trial court properly excluded this testimony.

Failure to Give Special Penalty Phase Jury Instructions
Darling's argument that he was entitled to requested special penalty phase jury instructions (including an instruction on circumstantial evidence, a modification of the standard instruction on aggravating factors and mitigating circumstances, and an instruction regarding victim impact evidence) *163 also lacks merit. The record in this case does not support the conclusion that the trial court abused its discretion in failing to give the requested instruction on circumstantial evidence. See In re Standard Jury Instructions in Criminal Cases, 431 So.2d 594, 595 (Fla.1981) (observing that "[t]he elimination of the current standard instruction on circumstantial evidence does not totally prohibit such an instruction if a trial judge, in his or her discretion, feels that such is necessary under the peculiar facts of a specific case," but that "the giving of proposed instructions on reasonable doubt and burden of proof ... renders an instruction on circumstantial evidence unnecessary"). Additionally, we have repeatedly held that further clarifying instructions regarding mitigating circumstances are not required. See, e.g., Booker v. State, 773 So.2d 1079, 1090 (Fla.2000) (observing that the Court has repeatedly held that clarifying instructions on mitigating circumstances are not required); Elledge v. State, 706 So.2d 1340, 1346 (Fla.1997) (finding that the trial court did not err in refusing to give a special jury instruction addressing the nature and functioning of mitigating circumstances where the trial court had given the standard instruction on mitigating circumstances), cert. denied, 525 U.S. 944, 119 S.Ct. 366, 142 L.Ed.2d 303 (1998); Shellito v. State, 701 So.2d 837, 842 (Fla.1997) ("This Court has repeatedly determined that the requested clarifying instructions on mitigating evidence are not required."), cert. denied, 523 U.S. 1084, 118 S.Ct. 1537, 140 L.Ed.2d 686 (1998). Lastly, the instruction given by the trial court here regarding victim impact evidence comported with the law as set out in Windom v. State, 656 So.2d 432, 438 (Fla.), cert. denied, 516 U.S. 1012, 116 S.Ct. 571, 133 L.Ed.2d 495 (1995), and Bonifay v. State, 680 So.2d 413 (Fla.1996).

Absence of a Complete Record on Appeal
Darling argues that there are no records of certain pretrial hearings which occurred in this case, precluding meaningful consideration of Darling's claims. However, Darling has failed to demonstrate what specific prejudice, if any, has been incurred because of the missing transcripts. The missing portion of the transcript has not been shown to be necessary for a complete review of this appeal. Cf. Velez v. State, 645 So.2d 42, 44 (Fla. 4th DCA 1994) (concluding that the appellant was not prejudiced in the review of his conviction and sentence, "[c]onsidering the limited portion of transcript which is missing and the errors alleged to have occurred in the trial court"). Therefore, this claim too lacks merit.

Proportionality
Darling argues that his death sentence is not proportionate. Here, the trial court applied the correct rule of law in making its findings regarding the aggravators, and in according weight to those factors. The record supports the trial court's findings regarding both the aggravating and the mitigating factors.[17] The trial court, after *164 carefully considering and weighing these factors, concluded, consistent with the jury's recommendation, that "the aggravating circumstances outweigh the mitigating circumstances present."
The cases cited by the appellant to support a disproportionality argument are inapposite, involving defendants who were immature and suffering from far more significant mental impairment, had no prior violent criminal history, or had a prior violent felony which was not as egregious as the one committed here. Cf. Larkins v. State, 739 So.2d 90, 95 (Fla.1999) (finding death sentence disproportionate where the trial court found extensive mitigation, including two statutory mental mitigators, and this Court observed that the killing appeared "to have resulted from impulsive actions of a man with a history of mental illness who was easily disturbed by outside forces"); Snipes v. State, 733 So.2d 1000, 1007-08 (Fla.1999) (finding death sentence inappropriate where the defendant, who voluntarily confessed to the crime which had been arranged by older individuals, was only seventeen at the time he committed the murder; was sexually abused for a number of years as a child; abused drugs and alcohol beginning at a young age; had no prior violent history; suffered childhood trauma, and was easily led by older persons); Johnson v. State, 720 So.2d 232, 238-39 (Fla.1998) (finding death sentence disproportionate where the prior violent felony aggravating circumstance, although properly found to be present, was not strong when the factsthat the aggravator was "based in part on an aggravated assault committed by Calvin upon his brother, Anthony," who testified "that he was not injured in the confrontation with his brother and that the entire incident occurred because of a misunderstanding" were considered and balanced against the statutory and nonstatutory mitigation established); Hawk v. State, 718 So.2d 159, 163 (Fla.1998) (finding death penalty to be disproportionate where the trial court had "found numerous nonstatutory mitigating circumstances, including brain damage, mental and emotional disturbance, loss of hearing, disadvantaged and abusive childhood, and lack of education and training,"); Robertson v. State, 699 So.2d 1343, 1347 (Fla.1997) *165 (finding death sentence was not proportionately warranted in light of the substantial mitigation present in the case), cert. denied, 522 U.S. 1136, 118 S.Ct. 1097, 140 L.Ed.2d 152 (1998). The record here does not support a finding of such immaturity or mental deficiency. When compared to other, more analogous cases, the appellant's death sentence is proportionate. Cf. Shellito v. State, 701 So.2d 837 (Fla.1997) (finding death sentence proportionate where the defendant was not a minor, had intellectual functioning in the low average range of intelligence, had a prior violent felony conviction and was on probation at the time he committed the murder, and had committed three robberies and an aggravated assault on a police officer within days of the murder), cert. denied, 523 U.S. 1084, 118 S.Ct. 1537, 140 L.Ed.2d 686 (1998); Ferrell v. State, 680 So.2d 390, 391-92 (Fla.1996) (finding death sentence commensurate to the crime in light of the similar nature of Ferrell's prior violent offense) (citing King v. State, 436 So.2d 50 (Fla.1983) (death sentence affirmed for shooting live-in girlfriend where prior conviction was for axe-slaying of common-law wife), cert. denied, 466 U.S. 909, 104 S.Ct. 1690, 80 L.Ed.2d 163 (1984)); Lemon v. State, 456 So.2d 885 (Fla.1984) (death sentence affirmed for stabbing and strangling of girlfriend where prior conviction was for assault with intent to commit first-degree murder for stabbing female victim), cert. denied, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985); Harvard v. State, 414 So.2d 1032 (Fla.1982) (death sentence affirmed for shooting second ex-wife where prior conviction was for aggravated assault arising from shooting attack on first ex-wife and her sister), cert. denied, 459 U.S. 1128, 103 S.Ct. 764, 74 L.Ed.2d 979 (1983).

The Vienna Convention on Consular Relations
In his last claim, Darling, who is a foreign national and citizen of the Bahamas, argues that, following his arrest, the police never informed him of his right to seek contact with his consulate to arrange for legal representation. Although the authorities did not use any post-arrest statements obtained from Darling, he submits that the death penalty should be precluded because of this alleged violation of Article 36 of the Vienna Convention, which provides that a foreign national arrested in the United States has the right to be informed that he may contact his consulate.[18]
It is unclear that the Vienna Convention creates individual rights enforceable in judicial proceedings.[19]Cf. Maharaj v. State, *166 778 So.2d 944, 959 (Fla.2000) (observing that Maharaj's claim that the State had failed to comply with its international obligation to inform the British Consul that a British citizen had been charged with a capital crime, as required under the Vienna Convention, failed not only because the issue was, in that case, procedurally barred, but also because Maharaj had "failed to establish that he has standing, as treaties are between countries, not citizens") (citing Matta-Ballesteros v. Henman, 896 F.2d 255 (7th Cir.1990)). Indeed, the preamble to the treaty reflects the recognition "that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States." Vienna Convention, preamble, 21 U.S.T. at 79.
However, we need not reach that issue where, as here, Darling has failed to show that he was prejudiced by the claimed violation. As was stated in Breard v. Greene, 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998), "it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial." Id. at 372, 118 S.Ct. 1352.

CONCLUSION
For the reasons discussed above, we affirm Darling's first-degree murder conviction and sentence of death. We also affirm Darling's conviction and sentence for armed sexual battery.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, and LEWIS, JJ., concur.
ANSTEAD, PARIENTE, and QUINCE, JJ., concur in result only.
NOTES
[1] Dr. Anderson stated that he had "seen many, many sexual assault victims that don't have ... defense wounds...." He observed, further, that in "[t]he majority of the cases of sexual battery ... they don't put up a struggle."
[2] The National Research Council was organized by the National Academy of Sciences in 1916.
[3] The FBI's African-American population database was used, based on "seven hundred to a thousand" samples "collected around the country."
[4] Baer testified that he did two statistical calculations for each database, using the product rule in addition to the modified ceiling principle. As we explained in Brim v. State, 695 So.2d 268 (Fla.1997):

The "product rule" is a traditional calculation used by statisticians and population geneticists to calculate population frequency statistics. It is well explained in the 1992 NRC report. A more detailed explanation of the calculations performed in creating population frequency statistics is set out in the 1996 NRC report.
Id. at 272 n. 7. In Brim, further, we specifically addressed the use of "multiple reasonable deductions" to satisfy the test established in Frye v. United States, 293 F. 1013 (D.C.Cir. 1923):
We may allow multiple reasonable deductions when all are based on generally accepted principles of population genetics and statistics. At the time this case was tried, processes that did not utilize the "ceiling principles" might not have satisfied the Frye test because those calculations did not take into account the possibility of population substructures. A sizeable portion of the scientific community speculated that failure to account for population substructures made "product rule" statistics unreliable. In 1996, that view changed and, therefore, the "ceiling principles" are no longer necessary. We do not find, though, that they are unreliable. While the results obtained through the use of "ceiling principles" might be unduly conservative, the scientific principles underlying the calculations are still generally accepted. By analogy, the fact that we now have calculators does not make long-hand arithmetic unreliable. If anything, calculators only make such long-hand work unnecessary. Necessity, though, is not the concern of the Frye analysis.
695 So.2d at 273 (footnote omitted).
[5] The Caucasian database usedwhich had "been reviewed by a statisticianwas" "based on a population study" including 166 samples, which was done by FDLE in Orlando in 1990 or 1991. In comparing his database numbers with others globally, Baer found them to be comparable.
[6] Baer did not have a DNA database for Bahamian people; when asked if there were any, he replied: "I suppose there might be, I don't know." He added that he "believed" that the Broward County Lab did "a Bahamian study," but he did not have "those figures." When asked by defense counsel whether there were "certain ethnic groups that have wildly different DNA than the rest of the population of the Earth," Baer replied that "where you might find that is if you have a very inbred group, like an isolated Indian tribe where they have just have certain markers which they keep reproducing. But generally found within the United States as a wholethere's a fairly good distribution of the major types within major ethnic groups."
[7] The FBI's Eastern Hispanic database was used; this is "published by the FBI actually based on samples from the Miami area." Baer also had a Hispanic database compiled from Arizona, California, and Texas. The Hispanic database had "seven- to eight-hundred" samples. Baer testified that the FBI databases were compiled at "around the same time" as the Orlando database.
[8] Darling had been on probation for shoplifting.
[9] After the jury retired to deliberate, Darling addressed the court:

I did not rape anyone.... Mr. Ashton [the prosecutor] stated ... that I didn't know Grace [Mlynarczyk]I never said I didn't know Grace Mlynarczyk. I never denied having a sexual relationship with Grace Mlynarczyk. So he was straying, had the jury off into a different direction.
[10] Specifically, Darling raised the following issues in his initial brief: that the trial court reversibly erred in (1) denying Darling's motion for judgment of acquittal; (2) admitting DNA evidence; (3) not allowing defense counsel to comment on the State's failure to exclude other suspects; (4) limiting Darling's voir dire examination during jury selection; (5) denying Darling's requested instruction regarding circumstantial evidence; (6) precluding defense counsel's rebuttal closing argument where the State had waived its closing argument; (7) refusing to allow Darling to argue residual doubt as a mitigator; and (8) denying Darling's requested special penalty phase jury instructions. Additionally, Darling asserted that (9) the absence of a complete record on appeal deprived him of adequate appellate review; (10) his death sentence is disproportionate; and (11) his death sentence violates the Vienna Convention on Consular Relations, 596 U.N.T.S. 261 (Dec. 24, 1969) (the "Vienna Convention").
[11] Although there is a suggestion in the record that a "study" may have been done in Broward County regarding a potential Bahamian database, the record does not reflect that such a database actually existed at the time the DNA analysis was conducted in this case.
[12] The "variable numbers of tandem repeats" (VNTR) test is the DNA test which was employed in Darling's case.
[13] Kenneth K. Kidd, a professor of genetics, psychiatry, and biology at Yale University, also testified in Penn. He contrasted the genetic makeup of the United States and St. Thomas populations with that of small isolated tribes, such as those living in the Amazon or Papua, New Guinea, having "small communities with languages that are mutually unintelligible," observing that "[s]uch tribes live in small geographic areas and rarely marry or breed out of the tribe." 838 F.Supp. at 1072. He cautioned against assigning the bin frequencies of these tribes to the bands of a suspect from the United States or St. Thomas, suggesting that the suspect's DNA profile in such case might appear to be much rarer than it would be if the profile were assigned the frequencies of the United States or St. Thomas populations. Id. Here, too, Baer indicated that, if there is a very inbred group, like an isolated Indian tribe, individuals may have certain markers which they keep reproducing. Such considerations would not apply to areas such as the Bahamas which are not similarly geographically isolated.
[14] Indeed, in making this observation, the court opined that, accordingly, it need "not decide whether the `ceiling principle method,'" described as a "mathematical formula advocated by [one of the defense experts] as an adequate means to remedy what he perceives to be a statistical error in applying the United States black population's bin frequencies to the suspect's bands," should be admitted. Id. & n. 10. In Darling's case, Baer testified that the National Research Council had formed a second committee specifically to address the statistical question, and this had resulted in a recommendation that the ceiling principle method went too far, and was too conservative. Baer testified that, to compensate for the differences within substructures, this second National Research Council committee "recommended one modification, which we have done when we do a calculation, we open up our match window twice what we had normally done before. So instead of plus or minus 1.735 percent, they now say plus or minus 3½ percent."
[15] Indeed, the transcript reflects that defense counsel knew that the State was entitled to waive a closing statement, and "knew that might be coming."
[16] Although this line of summation was successfully challenged by the prosecutor, whose objection was sustained, the jury was not instructed to disregard these remarks.
[17] The trial court found that the following aggravating factors had been proven beyond a reasonable doubt: (1) that the defendant was previously convicted of a felony involving the use or threat of violence to the person (carjacking with a firearm, robbery, and aggravated battery), and (2) that the capital felony was committed while the defendant was engaged in the commission of the crime of armed sexual battery. The court found and weighed the following statutory and nonstatutory mitigating factors: (1) the chronological and mental age of the defendant (modest weight) (no other statutory mitigators were either requested or found); (2) that the defendant exhibited acceptable behavior at trial (little weight); (3) that the defendant has an IQ of 85 (some weight); (4) that the defendant believes in God (slight weight); (5) that the defendant was and is a caring son to his mother (some weight); (6) that the defendant is a caring father to his daughter, who will need his love and encouragement in her life (moderate weight); (7) that the defendant was an abused child, beaten many times by his father (deemed "most weighty"); (8) that the defendant had and has an alcoholic father (considered in connection with the abuse factor); (9) that the defendant was never violent to his mother or girlfriend (considered in connection with the defendant's relationship to his mother); (10) that the defendant had no father figure or male role model (considered in connection with the abuse factor); (11) that the defendant sends cards for family holidays and birthdays (slight weight); (12) that the defendant was and is a concerned brother (slight weight); (13) that the defendant's child will have no father if the defendant is executed (considered in connection with defendant's relationship to his daughter); (14) that the defendant has a good employment history (slight weight); (15) that the defendant's father was not faithful to his mother (considered in connection with the abuse factor); (16) that the defendant was embarrassed because his mother and father never married (considered with the abuse factor); (17) that the defendant is a human being (not a mitigator, although the court found the defendant "equally entitled to our compassionate treatment and the mercy of his maker as any person in equally grave circumstances"); (18) that the defendant has the love and support of his family (slight weight); (19) that the defendant has been unwavering in his declaration of innocence (slight weight); and (20) that, if the defendant is sentenced to life in prison, he will be isolated from his family and friends who reside in a foreign county (moderate weight). No other statutory or nonstatutory mitigating factors were found.
[18] The record reflects that Darling filed a motion seeking this relief in the trial court, in which he failed to state that he is a foreign national, or whether the Bahamas is a signatory to that treaty. Because the treaty speaks of "sending states" and "receiving states," it is questionable whether, as Darling argues, the United States would incur obligations under the treaty to foreign nationals of non-signatory states. Further, the record does not reflect that Darling obtained a ruling on his motion in the trial court. Cf. Nelson v. State, 85 So.2d 832 (Fla.1956) (holding that the question of any irregularities in the information was "foreclosed and cannot be raised on appeal" where the appellant had "failed to show that any ruling was ever made upon the Motion to Quash filed by him"); see also Ibarra v. State, 11 S.W.3d 189, 197 (Tex.Crim. App.1999) (holding that the contention that Ibarra's conviction should be reversed because he was not informed of his rights under the Vienna Convention was not preserved for review where the record failed to show that "the complaint was timely made to the trial court, the grounds were specifically stated or were readily apparent, the complaint complied with the rules of evidence or appellate procedure, and the requirement of a ruling on the complaint" was satisfied), cert. denied, 531 U.S. 828, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000).
[19] As observed by the Seventh Circuit in U.S. v. Lawal, 231 F.3d 1045 (7th Cir.2000):

While some courts, including ours, have had the opportunity to decide whether Article 36 creates individual rights enforceable in judicial proceedings, all have sidestepped the issue. See Breard v. Greene, 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (per curiam); United States v. Chaparro-Alcantara, 226 F.3d 616, 623-24 (7th Cir.2000); United States v. Cordoba-Mosquera, 212 F.3d 1194, 1196 (11th Cir.2000) (per curiam); United States v. Lombera-Camorlinga, 206 F.3d 882, 885 (9th Cir. 2000) (en banc); United States v. Li, 206 F.3d 56, 60 (1st Cir.2000). Likewise, we need not decide the issue today because it does not affect our disposition of this case.
Id. at 1048.