# Supreme Court of Florida

_____

No. SC13-1
_____

**LEON DAVIS, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[November 10, 2016]

PER CURIAM.

This case is before the Court on appeal from two judgments of conviction of first-degree murder and two sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Leon Davis, Jr. (Davis), was convicted in Polk County of the 2007 murders of Dashrath Patel and Pravinkumar Patel, and he now pursues the direct appeal of his convictions and sentences which are subject to automatic review by this Court. For the reasons explained below, we affirm the trial court's judgments of conviction and sentences of death.

Before we begin, we further explain that Davis is the appellant in two separate death penalty direct appeals. In the present case, SC13-1, Davis was

convicted of two counts of first-degree murder, one count of attempted first-degree murder, and one count each of attempted armed robbery and possession of a firearm by a convicted felon. These convictions arose from the attempted armed robbery of a BP gas station and convenience store in Polk County, and Davis was sentenced to death for both of the murders.

Today, this Court also released its opinion in Davis v. State, No. SC11-1122 (Fla. Nov. 10, 2016). In that case, Davis was convicted of three counts of first-degree murder, one count of attempted first-degree murder, and one count each of armed robbery and first-degree arson. The convictions arose from a series of events at the Headley Insurance Agency in Lake Wales. Davis was sentenced to death for two of the murders. The murders in the Headley case occurred within several days of the murders in this case. A limited scope of evidence from the Headley trial was introduced during the guilt phase of the BP trial, and the entire Headley record was admitted for purposes of the penalty phase. Some of the issues that Davis raises in the present appeal challenge the admission of evidence from the Headley case. Additionally, Davis raises two issues (dying declaration and eyewitness identifications) in both direct appeals. We now set forth the facts of this case and then address Davis's claims on direct appeal.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

On the evening of December 7, 2007, Davis drove to the vicinity of a BP gas station and convenience store (BP) with the intent to commit robbery. The BP was located near the intersection of Highway 557 and Interstate 4 in Polk County. Around 8:51 p.m. that evening, BP employee Dashrath Patel (Dashrath) and his friend Pravinkumar Patel (Pravinkumar) walked out of the convenience store's front door and across the parking lot to change the gas price sign.

The BP had closed for the evening, and the convenience store lights were turned off. While talking on the telephone, another BP employee, Prakashkumar Patel (Prakashkumar), remotely locked the store's front door and began to change the gas prices on the cash register. Seconds later, the surveillance camera captured a person who appeared to be a black man, about six feet tall, who approached the front door of the store and pulled on the door. The man, who had a large build, was dressed in dark clothing and wore a hood and a face mask.

Prakashkumar indicated to the man that the store was closed. The man then raised a gun to the window and fired one shot into the store towards Prakashkumar. Suddenly, the shooter's attention was drawn to Dashrath and Pravinkumar, and he ran across the parking lot toward them. Surveillance footage showed both men with their hands in the air, and Prakashkumar reported hearing two gunshots that occurred about five to ten seconds apart. According to the surveillance footage,

the gunshots were fired at approximately 8:53 p.m. After firing the gunshots, the shooter ran back to the store's locked front door and tried in vain to open it. He raised his gun again, but he then turned and ran away from the scene.

In the meantime, Prakashkumar had activated the silent alarm, called 9-1-1, and sheltered in the storeroom. Upon arrival at the scene, the responding deputies learned that there were two missing people. Following a brief search, the bodies of Dashrath and Pravinkumar were located. Both victims were shot in the head execution-style with .38 caliber bullets.

With the assistance of a trained K-9 search dog, law enforcement searched the immediate area for the scent of a person who may have recently left the scene. The K-9 detected a scent that tracked about one quarter of a mile to the north of the gas station. Footprints led in the same direction that the K-9 tracked, up to the point where a set of tire tracks began. A crime scene technician photographed and made casts of the tire tracks.

In the days following the murders, law enforcement conducted traffic stops in the area of the BP to question drivers who may have seen something pertinent on the evening of the murders. During the course of these stops, four people provided information regarding a car that was parked that evening in an isolated area near the gas station. The witnesses described a dark-colored car, possibly a

black Nissan, backed up against a gate. One of the witnesses described the car as having a distinctive grille on the front end.

Davis was not identified as a suspect in the December 7 BP murders until after the December 13 robbery, arson, and shootings at the Headley Insurance Agency in Lake Wales (Headley). Davis was positively identified as the perpetrator of those crimes. The lead detective in both the BP and the Headley investigations was Detective Ivan Navarro. Detective Navarro requested an analysis of the ballistics evidence obtained during the course of the BP and Headley investigations. The results of the analysis demonstrated that the same gun was used in the crimes at the BP and at Headley.

During the Headley investigation, a black Nissan Altima with a distinctive grille was seized from the parking lot of a local nightclub, and during a search of the car, Davis's driver license was found inside. Additionally, two dark-colored jackets were found in the car's trunk, and a pair of black gloves was found in the glove compartment. In light of the witness reports that a possibly black Nissan was parked near the BP on the evening of December 7, Detective Navarro requested an analysis of the BP tire casts and the tires from the Nissan Altima linked to Davis to look for similarities. The tires from Davis's Nissan Altima were consistent with the BP tire casts.

A grand jury later indicted Davis for multiple counts stemming from the BP events: two counts of first-degree murder, one count of attempted first-degree murder, one count of attempted armed robbery, and one count of possession of a firearm by a convicted felon.

**Guilt Phase**

Davis waived a jury trial in favor of a bench trial. The State's theory was that Davis was a man burdened by significant financial distress and that he committed the murders of Dashrath and Pravinkumar during the course of an attempted armed robbery of the BP.

Evidence admitted at the trial revealed the following. At the time of the murders, Davis and his wife, Victoria, were in debt and unemployed. Victoria was pregnant at the time and was on a leave of absence from work due to pregnancy complications. The mortgage payment for the couple's home was delinquent, and the couple had given up driving one of their vehicles and cancelled their cell phone accounts because of their financial troubles. The couple shared Victoria's black Nissan Altima.

On the day of the BP murders, Davis purchased a Dan Wesson .357 magnum revolver from his cousin, Randy Black. Black also gave Davis .38 caliber bullets which were compatible with the .357 magnum. Davis returned home after purchasing the revolver, but he left home again that evening between 6 and 7 p.m.

- 6 -

Davis was alone when he left, and he was driving the black Nissan Altima. Davis did not return home until between 9 and 9:30 p.m. Davis's home was a twenty-two to twenty-three minute drive from the BP.

Two days after the murders, Davis showed his mother the revolver that he purchased from Black. The known rifling characteristics of Davis's revolver, six lands and six grooves with right twists, were consistent with the characteristics of the projectiles obtained during the BP investigation, including the projectiles removed from the heads of the victims. The State's ballistics expert testified that .38 caliber projectiles could be fired from a .357 magnum firearm, and that the projectiles obtained during the BP investigation were consistent with having been fired from a Dan Wesson .357 magnum revolver.

The State introduced evidence from the Headley trial during the guilt phase of the BP trial. To prevent the introduction of improper evidence, the trial court entered a pretrial order that sharply limited the admissibility of Headley evidence. The limited Headley evidence revealed that on the morning of December 13, 2007, Davis went to the Lake Wales Walmart to make a purchase. Surveillance video footage obtained from the store depicted a tall black man entering the store around 7 a.m., and both a store manager and an employee positively identified the man in the video as Davis. While at Walmart, Davis purchased an orange lunch cooler.

That afternoon, Davis went to Headley, where he encountered Headley employee Yvonne Bustamante and shot her in her left hand. Shortly thereafter, Davis encountered Brandon Greisman near the Headley building. Greisman and his neighbors, who lived nearby, had walked towards the Headley building upon noticing the presence of smoke in the area. Greisman, who saw Davis and thought that he was there to offer help, saw Davis pull a gun out of an orange lunch bag and point it in his direction. Greisman tried to get away but was unable to do so before Davis shot him in the nose. Greisman was transported to Lake Wales Hospital, where he underwent surgery and remained in the hospital overnight.

When Greisman was released, his mother drove him to the Lake Wales Police Department to speak to detectives. Greisman was shown a photographic lineup and asked if he recognized the man who shot him the day before. Greisman recognized Davis's photograph almost immediately and identified him as the shooter. At trial, Greisman also identified Davis from the witness stand.

Eyewitness Carlos Ortiz, who saw Davis place the gun into a lunch bag shortly after Greisman was shot, also identified Davis as the Headley shooter. At trial, Ortiz testified that in addition to getting an extended look at Davis at the scene, he recognized Davis because he previously saw Davis at Florida Natural Growers, where both men used to work. A few days after the Headley incident,

Ortiz identified Davis's photograph from a photographic lineup.  Ortiz also identified Davis from the witness stand.

Another Headley eyewitness, Fran Murray, testified that as she approached the Headley building, she saw a tall black man carrying an orange collapsible lunch pail, and she saw him place what appeared to be a gun inside of it.

Evelyn Anderson, a Headley customer, saw a tall black man exit the Headley building with a bag under his arm.

Ortiz and Murray also testified that they saw a black car in the area of the Headley building around the time of the shooting.  The car was parked near a vacant house.  Murray described the car as mid-sized, and Ortiz identified it as a Nissan.

Davis was also identified by the dying declaration of Yvonne Bustamante. Upon arriving at the Headley scene, Lt. Joe Elrod asked Bustamante if she knew the perpetrator's identity, and she responded, "Leon Davis."  Bustamante told Lt. Elrod that Davis was a former Headley customer.   In addition to Lt. Elrod, two emergency medical responders and eyewitness Anderson heard Bustamante identify Davis as the perpetrator.

The State's ballistics expert testified that the same gun was used in the BP murders and in the shootings at Headley.

## Davis's Defense

Davis's defense was misidentification. He offered an alibi for the time of the murders and attacked the eyewitness identifications made during the course of the Headley investigation.

Testifying in his own defense, Davis stated that on December 7, 2007, he brought his son to his home. Around 7:15 p.m., he left home alone to go Christmas shopping at the mall. Davis admitted that he was driving the black Nissan Altima at the time. While shopping, Davis did not see anyone that he recognized. Davis testified that although he spent around $150 in cash on clothing purchases, he did not have documentation for the purchases. He also testified that the money that he used to go shopping came from money that he had at home and a paycheck he had received the day before.

Davis testified that he left the mall around 8:30 p.m. and returned home around 9 p.m. He stated that he spent the rest of the evening at home with his family, leaving only briefly with his family between 9 and 10 p.m. to get dinner.

Davis also testified that less than one week later, he left the Nissan Altima parked at a nightclub, and that the gloves and jacket that the police later found in the car belonged to his wife, Victoria. Davis testified that he kept an unloaded gun in a toolbox in the garage that may have been unlocked, and that neither Victoria nor his son knew about the gun.

Davis was convicted as charged.

## Penalty Phase

Davis's bench trial proceeded to the penalty phase, where he waived his right to a penalty phase jury. The State sought to prove four aggravating circumstances: (1) the capital felony was committed by a person previously convicted of a felony and on felony probation; (2) the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person; (3) the capital felony was committed while the defendant was engaged in a commission of, or an attempt to commit, or flight after committing a robbery; and (4) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.[1]

The parties stipulated to Davis's July 2007 convictions for grand theft. Additionally, the State presented three witnesses who testified about the facts of the Headley murders, which were the basis for the prior capital/violent felony aggravating circumstance.[2] Lt. Elrod, who previously testified that Headley

---

1. The trial court later rejected the avoid arrest aggravating circumstance as not proven.

2. The trial court's order limited the scope of the Headley evidence that was admissible during the guilt phase. However, during the penalty phase, the trial court learned that prior to the shootings of Yvonne Bustamante and Brandon Greisman, Davis had robbed the insurance agency and set the building and two employees, Bustamante and Juanita Luciano, on fire. At the time, Luciano was

- 11 -

shooting victim Bustamante identified Davis as the perpetrator and explained that Davis tried to rob her, testified during the penalty phase that Bustamante explained how Davis threw gasoline on her and set her on fire when she told him that she did not have any money.

The medical examiner in the Headley case, Dr. Stephen Nelson, testified regarding the injuries and causes of death of the three deceased victims, Bustamante, Juanita Luciano, and Luciano's newborn son, Michael. Bustamante and Luciano both died from thermal burns. Bustamante's burns covered eighty to ninety percent of her body, and Luciano's burns covered ninety percent of her body. Luciano's son, Michael, was delivered prematurely on the day of the events at Headley and died from extreme prematurity three days later. Additionally, crime scene technician Stacy Greatens testified regarding photographs of the Headley crime scene, including photographs of a cigarette lighter, duct tape, a burnt gas can, burnt shoes, and a burnt chair.

### Davis's Mitigation

As mitigation, Davis presented evidence of a sexual assault when he was eight years old, severe physical abuse by a caretaker in the years following the sexual assault, ongoing depressive and mood episodes, and a suicide attempt while

_____

twenty-four weeks pregnant. Davis shot Bustamante and Greisman during the course of his escape from the building.

- 12 -

he was in the military. Davis submitted for the court's consideration the testimony of the three mitigation witnesses from the Headley trial: Dawn Henry, the mother of Davis's son; Linda Davis, Davis's mother; and India Owens, Davis's sister. Davis also introduced his medical records from his military service.

Davis's mother described her relationship with Davis as very close. Although Davis's father moved out of the family home when Davis was about one year old, his father maintained a relationship with Davis.

From elementary through high school, Davis suffered an ongoing pattern of bullying. When Davis was eight years old, another boy beat and sexually assaulted him. Although Davis's family members were aware of the assault, they did not talk about it.

Additionally, when Davis was around eight or nine years old, a woman named Ms. Clark came to live in the family home as a roommate. Eventually, Davis and his brother moved out of the family home and into another home with Clark. Clark was an alcoholic and was physically and verbally abusive. She taunted and verbally abused Davis because he was bullied, and she also beat him with extension cords and water hoses and punched him in the chest in order to try and make him "be a man." On one occasion, Clark severely beat Davis with an extension cord. Davis ran home to his mother, who observed severe injuries to his

back.  Family members observed physical injuries such as welts, bleeding, and scabs and sores on Davis's body.

In middle school, Davis contemplated suicide, and his mother encouraged him not to take his life.  Davis received mental health counseling for two to three months.  Davis later joined the military and while enlisted, he attempted suicide by hitting a concrete pole while driving at a high rate of speed.  Thereafter, he was discharged from the military.

After Davis was discharged from the military, he met Dawn Henry.  Henry and Davis eventually had a son who was born with Down Syndrome.  Henry testified that while she had trouble adjusting to being a mother of a child with special needs, Davis immediately accepted his son and was consistently and frequently present in his life.  Around the time of the Headley robbery, Davis was depressed and upset that he could not afford to do anything for his son's approaching birthday.  When Davis purchased the gun shortly before the robbery, his mother was concerned that he might use the gun to commit suicide.

### Spencer Hearing and Sentencing

Prior to sentencing Davis for the BP crimes, the trial court held a Spencer[3] hearing.  Although no additional evidence was introduced, the defense made

---

3. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

additional argument, and Davis made a statement to the Court that he was not near the BP gas station on December 7. The trial court ultimately sentenced Davis to death for the murders of Dashrath and Pravinkumar. Each sentence of death was based on the following aggravating circumstances: (1) the capital felony was committed by a person previously convicted of a felony and on felony probation (moderate weight); (2) the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person (very great weight); and (3) the capital felony was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing a robbery (great weight). The trial court rejected as not proven that either capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

The trial court also considered statutory and nonstatutory mitigating circumstances. The trial court found the existence of one statutory mitigating circumstance: the crime was committed while Davis was under the influence of extreme mental or emotional disturbance (little weight). Due to Davis's convictions for grand theft several months before the BP murders, the trial court rejected as statutory mitigation that Davis had no significant prior criminal history. The trial court also considered fifteen nonstatutory mitigating circumstances: (1) victim of bullying throughout childhood (moderate weight); (2) victim of

sexual assault as a child (moderate weight); (3) victim of child abuse, both physical and emotional, by a caretaker (moderate weight); (4) overall family dynamics (little weight); (5) military service in the U.S. Marine Corps (little weight); (6) history of being suicidal both as a child and as an adult (slight weight); (7) diagnosed personality disorder (slight weight); (8) history of depression (slight weight); (9) stressors at the time of the incident (little weight); (10) good person in general (very slight weight); (11) good worker (little weight); (12) good son, good sibling, good husband (moderate weight); (13) good father to a child with Down Syndrome (moderate weight); (14) good behavior during trial as well as other court proceedings (slight weight); and (15) good behavior while in jail and in prison (little weight).

In addition to the sentences of death, the court also sentenced Davis to life imprisonment with a twenty-year minimum mandatory sentence for the attempted murder of Prakashkumar, twenty years' imprisonment with a twenty-year minimum mandatory sentence for attempted armed robbery, and fifteen years' imprisonment with a three-year minimum mandatory sentence for possession of a firearm by a convicted felon. Davis now appeals his convictions and sentences, which are subject to mandatory review by this Court.

## ISSUES ON APPEAL

On direct appeal, Davis raises twelve issues: (1) whether the trial court erred in admitting evidence of the Headley events during the guilt phase; (2) whether the trial court relied on facts not in evidence to find Davis guilty; (3) whether the trial court erred by allowing the impeachment of Victoria Davis; (4) whether the trial court improperly shifted the burden of proof to Davis; (5) whether the trial court erroneously used Davis's prior theft convictions as circumstantial evidence of his guilt for all charges; (6) whether the trial court erred in denying the motion for judgment of acquittal; (7) whether the evidence is sufficient to support Davis's attempted robbery conviction; (8) whether the trial court erred in admitting the hearsay statement of Yvonne Bustamante as a dying declaration; (9) whether the trial court erred in allowing the prosecution to introduce the pretrial and in-court identifications made by Brandon Greisman and Carlos Ortiz; (10) whether the trial court abused its discretion and distorted the weighing process by improperly diminishing the weight assigned to two mitigating factors and attributing a greater weight to one aggravator than was previously assigned; (11) whether Davis's death sentences are proportionate; and (12) whether the Florida death penalty statutory scheme is facially unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002).

## I. Admission of Headley Facts During the State's Case

Before trial, the trial court entered a narrow ruling that allowed the State to introduce a limited amount of evidence from the Headley trial during the guilt phase of the BP trial. Among this evidence was eyewitness testimony identifying Davis as the Headley shooter, placing a black Nissan in the vicinity of the Headley building at the time of the shootings, and establishing that the same gun was used in both the BP and the Headley shootings. Davis argues that the trial court erred in admitting this evidence. However, on the distinct facts of this case, we conclude that this relevant and limited evidence, which did not become a feature of the trial, was properly admitted to establish the nexus between Davis and the BP crimes.

The trial court's detailed pretrial order provided that the following evidence would be admissible during the State's case:

1.      Randy Black, William Wagle, and Linda Davis will be allowed to testify about the gun and the Defendant's possession of a gun.

2.      Brandon Greisman and Carlos Ortiz (along with Detective Townsell who showed them the photo packs) will be allowed to testify as to their identifying Leon Davis as the man with the gun at the "Headley" crime scene but should not testify concerning the condition of the building (burning) or the condition of the victims (Ms. Bustamonte [sic] and Ms. Luciano).

3.      Evelyn Anderson, Lt. Joe Elrod, Ernest Froehlich, and John Johnson will be allowed to testify that Ms. Bustamonte [sic] identified Leon Davis as the person who shot her at the "Headley" crime scene but not

- 18 -

discuss Ms. Bustamonte's [sic] condition or any of their observations about her injury during direct examination, and should not testify concerning her other statements regarding the incident.

4. Mark Gammons and Jennifer Debarros (both employees of Wal-Mart) will be allowed to testify concerning their observations of the Defendant at the Wal-Mart store and the purchase of a cooler/lunch bag, but should not testify regarding the purchase of a cigarette lighter or other items not related to the BP case.

5. The videos and testimony concerning those videos obtained at Mid-Florida Credit Union, Beef O'Brady's and Enterprise Leasing will be admissible for comparative purposes in viewing the Wal-Mart video. The McDonald's video is not to be introduced into evidence until such time as the person depicted in it can be positively identified as Leon Davis, Jr.

6. Jacquelyn Hare and/or Scott Headley will be allowed to testify about the Defendant's prior business relationship with Headley Insurance Agency to the extent that he was a customer of the agency and had been seen at the agency on prior occasions. Neither of them will be allowed to testify as to the specific business transactions the Defendant had with Headley Insurance Agency.

7. In regard to the black Nissan that was purportedly seen at the "Headley" crime scene, Carlos Ortiz will be allowed to testify as to his observations. Other evidence concerning a black Nissan can be introduced outside of the context of it somehow being involved at the Headley Insurance Agency crime scene.

8. FDLE firearms analyst, James Kwong, will be allowed to testify that he identified the gun used in the "Headley" crimes as the same gun that was used in the BP crimes.

Our meticulous review of the trial transcript reveals that the State's presentation of evidence was consistent with the terms of the trial court's order. As we evaluate the propriety of the trial court's decision to admit evidence from the Headley trial, we consider the substance of the State's case, which may be summarized as follows.

On the afternoon of December 7, 2007, Davis purchased a .357 magnum Dan Wesson revolver from his cousin, Randy Black. That evening, Davis left home alone driving his wife's black Nissan Altima. At approximately 8:51 p.m., a man fitting Davis's description attempted to enter the BP convenience store and fired a shot into the store. At approximately 8:53 p.m., the man shot and killed Dashrath and Pravinkumar outside of the BP and left the scene. Around this time, four separate witnesses observed a dark-colored car parked in an isolated area in the vicinity of the BP. This car, definitively identified by one witness as a Nissan, bore a distinctive front-end grille. The description of this car was consistent with the black Nissan Altima admittedly driven by Davis that evening, and tire tracks left in the area of the BP were consistent with tires later removed from that car.

Two days after the BP murders, Davis showed his mother the revolver that he purchased from Black. Four days later, Davis was positively identified as the gun-wielding perpetrator of the shootings at Headley. In particular, Davis was positively identified by the two shooting victims, one of whom knew Davis as a

Headley customer. Multiple witnesses saw Davis conceal his gun in an orange lunch cooler after the shootings. One of the eyewitnesses who identified Davis as the Headley shooter also observed a black Nissan parked in the vicinity of Headley.

Ballistics evidence revealed that the projectiles retrieved from the BP and Headley crime scenes and from the autopsies of the deceased victims were all fired from the same gun. The rifling characteristics of the gun used to murder Dashrath and Pravinkumar at the BP and to shoot Bustamante at Headley were consistent with those of the .357 magnum Dan Wesson revolver that Davis purchased from Black mere hours before the BP murders.

Thus, evidence obtained as a part of the Headley investigation established the nexus between Davis and the BP crimes. Davis argues that the trial court erred in allowing the State to introduce this evidence as a part of its case against him. As we explain below, we disagree.

Our analysis begins with the threshold matter of relevance. In order to be admissible, evidence must be relevant. That is, the evidence must "tend[] to prove or disprove a material fact." § 90.401, Fla. Stat. (2012). While relevant evidence is generally admissible, such evidence "is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." §§ 90.402-

403, Fla. Stat. (2012). "A trial court has broad discretion in determining the relevance of evidence and such a determination will not be disturbed absent an abuse of discretion." Jorgenson v. State, 714 So. 2d 423, 427 (Fla. 1998) (citing Heath v. State, 648 So. 2d 660, 664 (Fla. 1994)).

This Court has observed that relevant evidence of another crime may be admissible against a defendant at trial. See Steverson v. State, 695 So. 2d 687, 689 (Fla. 1997). In deciding whether to admit such evidence though, the trial court must be acutely aware of the danger of the unfair prejudice that may result. "Even when evidence of a collateral crime is properly admissible in a case, we have cautioned that 'the prosecution should not go too far in introducing evidence of other crimes. The state should not be allowed to go so far as to make the collateral crime a feature instead of an incident.' " Id. (quoting Randolph v. State, 463 So. 2d 186, 189 (Fla. 1984)).

In the present case, the trial court did not abuse its discretion in determining that certain Headley evidence was relevant to prove that Davis committed the BP crimes. The purpose of admitting this evidence was to prove a material issue at trial. While the State lacked direct evidence that Davis fired the shots at the BP, ballistics evidence revealed that the same gun that fired the bullets that killed Dashrath and Pravinkumar at the BP also fired the bullets at Headley. Thus, Davis's possession of a gun at Headley, his firing of the gun, the retrieval of

projectiles fired from the gun, and the comparison of those projectiles with those obtained during the BP investigation established the nexus between Davis and the BP crimes.

Further relevant to placing Davis at the BP crime scene—and near an isolated location where a dark-colored vehicle, likely a black Nissan, was seen by four people—was the presence of a black Nissan in the vicinity of Headley around the time of the Headley shootings. Davis admittedly drove his wife's black Nissan Altima on the night of the BP murders. Thus, testimony that a black Nissan was spotted near the Headley crime scene where Davis was positively identified as the Headley shooter was relevant to place Davis at the BP on the night of the attempted robbery and murders.

We strongly emphasize that it is the totality of the evidence relating to the gun and the Nissan Altima that forms a solid evidentiary nexus between the two cases and leads us to conclude that limited Headley evidence was properly admitted during the guilt phase of the BP trial. The record reveals that the trial court closely guarded the admission of Headley evidence so as to allow only relevant evidence. Moreover, the court was also extremely careful to guard against the admission of the highly prejudicial details of the events at Headley involving the arson and Bustamante's condition. The court's carefully circumscribed order

prevented the details of the Headley crimes from becoming a feature of the BP trial.

The admission of limited Headley evidence avoided the error that occurred in Steverson, 695 So. 2d 687. Steverson was tried for the murder of an acquaintance, Lucas. Four days after Lucas's murder, Steverson shot a police officer who approached him while acting on an informant's tip. Id. at 689. Steverson was tried for the shooting of the officer before being tried for Lucas's murder, and was convicted. During the trial for the murder of Lucas, the State also introduced extensive evidence of the shooting of the police officer. Id. at 690. While we concluded that some limited evidence of the shooting was relevant to the State's case, "there was no justification for the admission of extensive details of [the officer's shooting] offered by four different witnesses, all of whom focused most of their testimony on the police officer's injuries and recovery." Id. In reversing and remanding Steverson's case for a new trial, we instructed that evidence of the police officer's shooting be "appropriately limited if it is sought to be admitted again." Id. at 691.

In the present case, acutely aware of the highly prejudicial details of the Headley crimes, the trial court carved out a narrow scope of admissible evidence. The trial court's strict order and the subsequent admission of the evidence described therein carefully avoided the pitfalls of admitting irrelevant or unfairly

prejudicial evidence and prevented the Headley crimes from becoming a feature of the trial. Therefore, Davis is not entitled to relief.

## II. Reliance on Headley Facts in Sentencing Order

Davis also maintains that the trial court improperly determined his guilt in the BP case based on his convictions in the Headley case and facts about the Headley events that were not admitted during the guilt phase. In particular, Davis points to statements in the sentencing order and argues that these statements demonstrate the trial court's erroneous consideration of the Headley convictions when determining his guilt in the BP case. In the sentencing order, the trial court said the following:

> On December 13, 2007, <u>a robbery and two murders occurred</u> at the Headley Insurance Agency in Lake Wales, Florida.
> . . . .
> On Thursday, December 13, 2007, the Headley Insurance Agency in Lake Wales <u>was robbed and Yvonne Bustamonte [sic] and Juanita "Jane" Luciano were bound with duct tape, saturated with gasoline, and set on fire.</u> They died as a result of their injuries.
> . . . .
> <u>The Jury in case number CF07-009386 found, beyond and to the exclusion of all reasonable doubt that the Defendant, Leon Davis, Jr., was the tall black male involved in the Headley Insurance Agency robbery and murders.</u> He was seen wielding and shooting a firearm during those crimes. The Court finds that the same firearm fired the projectiles that were recovered during the investigation of the crimes occurring at the BP Station.
> . . . .
> The circumstantial and non-circumstantial evidence concerning the Headley Insurance Agency crimes proves, beyond a reasonable doubt, that Leon Davis, Jr. robbed the Headley Insurance Agency and

> killed Yvonne Bustamonte [sic] and Juanita "Jane" Luciano <u>as was found by the Jury in that case.</u>
>
> . . . .
>
> The evidence comes down to this; Leon Davis, Jr. was positively identified as the gun wielding perpetrator of the Headley Insurance Agency crimes <u>and was convicted of those crimes.</u>

(Emphasis added.)

It is improper for a trial court to consider "evidence from a different trial that was not introduced in the guilt phase of the present trial." <u>Dailey v. State</u>, 594 So. 2d 254, 259 (Fla. 1991). However, Davis's argument that such error occurred in this case is without merit. Our review of the sentencing order reveals that the trial court was simply setting forth the historical facts of this case. Following an evidentiary hearing, the court concluded that during the guilt phase, the State would not be permitted to introduce evidence of the fire and the events inside Headley. A careful reading of the trial transcript reveals that this order was assiduously followed. In closely reading the testimony of the guilt phase witnesses who testified due to their roles in the Headley case, to a person, the testimony of each of these witnesses carefully avoided any comment on the facts surrounding what actually happened inside of Headley, the victims' burn conditions, and events that occurred later that day. For example, Fran Murray, Evelyn Anderson, Lt. Elrod, and the medical personnel, who offered graphic testimony about Bustamante's condition during the Headley trial, did not refer to this evidence during the BP trial. However, the entire Headley record was admitted during the

penalty phase of the BP trial, and evidence that was specifically excluded from the guilt phase was admitted during the penalty phase.

Davis's argument that the court relied on facts outside of the guilt phase record in determining his guilt for the BP crimes is inconsistent with the record evidence of the court's caution to avoid the introduction of irrelevant and prejudicial Headley evidence during the guilt phase. We are convinced that the trial court did not rely on such facts to establish Davis's guilt in the BP case and was merely setting forth the historical context of the case. Thus, we conclude that Davis is not entitled to relief.

### III.  Impeachment of Victoria Davis

Davis also argues that the trial court erred when it allowed the State to impeach his wife, Victoria, during her guilt phase testimony. In 2008, when Victoria testified before the grand jury, she stated that on the evening of December 7, Davis arrived home between 9 and 9:30 p.m. However, when she testified at Davis's trial, Victoria stated that Davis left home between 6 and 7 p.m. that night, and he was gone for about one hour. The trial court permitted the State to impeach Victoria on the grounds that her grand jury testimony was a prior inconsistent statement. The trial court did not err in doing so.

"The theory of admissibility [of a prior inconsistent statement] is not that the prior statement is true and the in-court testimony is false, but that because the

witness has not told the truth in one of the statements, the [finder of fact] should disbelieve both statements." Pearce v. State, 880 So. 2d 561, 569 (Fla. 2004). To be admissible, a prior inconsistent statement must either directly contradict or materially differ from the expected testimony at trial. Id. Moreover, "the inconsistency must involve a material, significant fact rather than mere details." Id.

In this case, the testimony at issue involved Davis's whereabouts at the time of the murders. If, as Victoria stated during her grand jury testimony, Davis did not come home until between 9 and 9:30 p.m., she could not account for Davis's whereabouts at the time of the murders. However, if Davis left home between 6 and 7 p.m. and returned about one hour later as Victoria testified at trial, Davis could not have been at the BP when the murders occurred shortly before 9 p.m. Thus, the inconsistency in Victoria's testimony relates to a "material, significant fact" and not "mere details." Id.

Victoria's grand jury testimony materially differed from her trial testimony and thus constituted a prior inconsistent statement. The salient portion of her trial testimony is as follows:

| Prosecutor: | As you sit here today, do you remember how long he was gone? |
|---|---|
| Victoria: | Exactly? |
| Prosecutor: | No, not exactly. |

Victoria:    <u>I remember that it wasn't too long, that it had to be somewhere around an hour, maybe a little more or a little less.</u> I can't exactly tell you. I just know it wasn't that long because he knew I was sick.

(Emphasis added.)

Davis argues that Victoria's trial testimony was not inconsistent with her grand jury testimony and suggests that Victoria only said that she did not recall when Davis returned home. However, the salient portion of her answer was that "it had to be somewhere around an hour, maybe a little more or a little less." In contrast to her grand jury testimony where she testified that Davis returned home between 9 and 9:30 p.m., she testified at trial that Davis was gone for only one hour after he left home between 6 and 7 p.m. Because of this material inconsistency, the trial court did not err in allowing the State to impeach her on these grounds.

## IV. Shifting the Burden of Proof

Davis also argues that during the BP trial, the trial court improperly shifted the burden of proof to the defense. In support of his argument, he points to the following language in the sentencing order:

> On the evening of December 7, 2007, Mr. Davis left his home sometime between 6:00 p.m. and 7:00 p.m. in his wife's Nissan Altima, allegedly to go shopping. His whereabouts are unknown until he returned sometime after 9:00 p.m. to 9:30 p.m. Mr. Davis claims he was at the Eagle Ridge Mall, but there is no evidence whatsoever to corroborate that claim.

Davis's burden-shifting argument is without merit.

"The accused is not required to prove an alibi beyond a reasonable doubt but where the accused attempts to establish an alibi, proof thereof must be sufficient to raise a reasonable doubt in the mind[s] of the [finder of fact] as to whether or not it was possible for the accused to have been at the scene of the crime at the time when the crime is shown to have been committed." Blakes v. State, 182 So. 447, 448 (Fla. 1938). Davis's alibi failed to raise a reasonable doubt in the trial court's mind as to whether Davis was at the BP at the time of the murders. The trial court's comment, therefore, merely reveals the deficiency of Davis's alibi defense. Davis is not entitled to relief.

## V. Prior Felony Convictions

In the sentencing order, the trial court referred to the fact that at the time that Davis attempted to rob the BP and murdered Dashrath and Pravinkumar, Davis was a convicted felon and on felony probation. In July 2007, several months before the BP crimes, Davis was convicted of felony grand theft and sentenced to probation. Based on this evidence, Davis was convicted of possession of a firearm by a convicted felon. Davis, though, argues that the trial court also considered the felony convictions as proof of his guilt for the murder, attempted murder, and attempted robbery charges. In the sentencing order, the trial court said the following:

- 30 -

The circumstantial and non-circumstantial evidence concerning the Headley Insurance Agency crimes proves, beyond a reasonable doubt, that Leon Davis, Jr. robbed the Headley Insurance Agency and killed Yvonne Bustamonte [sic] and Juanita "Jane" Luciano as was found by the Jury in that case. The gun used in those crimes was also used to murder Pravinkumar C. Patel and Dashrath Patel. Beyond the fact that the Defendant purchased a Dan Wesson .357 revolver from Randy Black and all six projectiles recovered from the two crime scenes are consistent with having been shot from the same type of firearm, there are numerous other circumstantial facts that lead to the conclusion, beyond a reasonable doubt, that Leon Davis, Jr. committed the BP murders.

Leon Davis, Jr. was facing some very serious financial setbacks. He did not have a job, and his wife was on leave from her employment due to a problem pregnancy. His credit cards were maxed out, and he only had a few dollars in his accounts at Mid Florida Federal Credit Union. He was behind on his mortgage payments, and he owed money on a loan to the bank. He had even given up his cell phone. Due to an inability to pay his insurance payments, he parked his Nissan Maxima and was using his wife's car. He was also facing his son's, Garrion's, upcoming birthday and the Christmas holidays.

In spite of his financial difficulties, Mr. Davis decided to purchase a gun and spent $220.00 on a Dan Wesson .357 revolver. <u>This is a very strange purchase, and an unlawful act, in light of the fact that the Defendant was a convicted felon on felony probation at the time of his acquisition of the firearm.</u>

(Emphasis added.) Davis argues that this language proves that the trial court considered his felony convictions as proof of his guilt on all of the charged offenses. Davis's argument is without merit.

The language emphasized by Davis must be read in context. The trial court did not conclude that Davis committed the BP crimes because he was a convicted felon. Rather, the trial court focused on Davis's purchase of the revolver before

- 31 -

the BP crimes. The fact that Davis purchased a .357 magnum revolver on the same day of the BP crimes is circumstantial evidence of his guilt. Davis is not entitled to relief on this issue.

## VI. Denial of Judgment of Acquittal

Davis also argues that the trial court erred when it denied his motion for judgment of acquittal for the murders of Dashrath and Pravinkumar. "In reviewing a motion for judgment of acquittal, a de novo standard of review applies." Reynolds v. State, 934 So. 2d 1128, 1145 (Fla. 2006) (citing Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002)). "[C]ourts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." Id. (quoting Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974)). "However, 'where a conviction is based wholly upon circumstantial evidence, a special standard of review applies.' " Id. (quoting Darling v. State, 808 So. 2d 145, 155 (Fla. 2002)).

"[A] motion for judgment of acquittal should be granted in a case based wholly upon circumstantial evidence if the [S]tate fails to present evidence from which the jury could exclude every reasonable hypothesis except that of guilt." Id. at 1146. However, "[t]he [S]tate is not required to 'rebut conclusively every possible variation' of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of

events." Darling, 808 So. 2d at 156 (quoting State v. Law, 559 So. 2d 187, 189 (Fla. 1989)). "Once the State meets this threshold burden, it becomes the jury's duty to determine 'whether the evidence fails to exclude all reasonable hypotheses of innocence . . . , and where there is substantial, competent evidence to support the jury verdict, [the Court] will not reverse.' " Reynolds, 934 So. 2d at 1146 (quoting Law, 559 So. 2d at 188)). In this circumstantial evidence case, Davis's hypothesis of innocence was that of misidentification. However, the State introduced competent evidence that is inconsistent with Davis's theory.

On December 7, 2007, Leon Davis purchased a .357 magnum Dan Wesson revolver from his cousin. That evening, Davis left home alone between 6 and 7 p.m., driving a black Nissan Altima. Around 8:51 p.m., a man fitting Davis's description attempted to enter the BP convenience store. When he could not gain entry, he fired a gunshot into the store. The man then ran across the parking lot and shot Dashrath and Pravinkumar in the head. The man ran back to the front door of the store, tried again to open it, raised the gun again, and then ran away.

Around the time of the attempted robbery and murders, four witnesses saw a dark-colored, likely black car parked in a secluded area in the vicinity of the BP. One of the witnesses definitively identified the car as a Nissan and described the car's distinctive grille on the front end. These descriptions are consistent with the black Nissan Altima that Davis admitted he was driving when he left home on the

evening of the murders. Testing later revealed that the tire tracks found near the BP were consistent with the tires on the Altima driven by Davis.

Two days after the murders, Davis remained in possession of the gun he purchased from his cousin and showed it to his mother. Four days later, Davis robbed the Headley Insurance Agency. He shot one of the employees, Yvonne Bustamante, in her left hand, and a concerned neighbor, Brandon Greisman, in the face. Bustamante identified Davis by name, as she knew Davis as a Headley customer. Greisman and another neighbor, Carlos Ortiz, identified Davis from photographic lineups shown shortly after the events at Headley. Ortiz also observed a black Nissan parked in an area behind a vacant house around the time of the Headley shootings.

Projectiles retrieved from the Headley crime scene and from Bustamante's autopsy were compared with the projectiles retrieved from the BP crime scene and from the autopsies of Dashrath and Pravinkumar. The projectiles were fired from the same gun, a gun whose rifling characteristics are consistent with the .357 magnum Dan Wesson revolver purchased by Davis on the same day as the BP murders. In sum, the same gun was used to murder Dashrath and Pravinkumar on December 7 as was used to shoot Bustamante and Greisman just days later, and Bustamante identified Davis as the shooter based on her personal knowledge of Davis. A car fitting the description of the black Nissan Altima driven by Davis

was seen near both crime scenes. This evidence is inconsistent with Davis's misidentification defense.

Davis's reliance on this Court's decision in Dausch v. State, 141 So. 3d 513 (Fla. 2014), is misplaced. Although Dausch was also a case where the defense was misidentification, there were significant deficiencies in the State's case in Dausch that do not exist in Davis's case. In Dausch, there was no link between Dausch and a murder weapon. In contrast, Davis purchased a .357 magnum revolver on the same day as the BP murders. Davis's revolver is consistent with the type of gun used to kill Dashrath and Pravinkumar. Moreover, in Dausch, the State was not able to place Dausch in the county where the crime occurred, let alone at the crime scene. In contrast, Davis's own testimony established that he was driving the black Nissan Altima that night, and four witnesses testified that a car resembling the one driven by Davis was near the crime scene at the time of the murders. Moreover, the tires from Davis's Nissan Altima were consistent with the tire tracks left near the BP, and his driver license was later found inside that car.

Because the State produced competent evidence that is inconsistent with Davis's theory of misidentification, the trial court properly denied Davis's motion for judgment of acquittal. Moreover, we conclude that the State introduced competent, substantial evidence of guilt sufficient to affirm Davis's convictions.

## VII. Sufficiency of Evidence of Attempted Armed Robbery

Davis contends that the State failed to prove intent to commit robbery of the BP, and that as such, the trial court should have granted his motion for judgment of acquittal on the charge of attempted armed robbery. The trial court's denial of a motion for judgment of acquittal is subject to de novo review. Pagan, 830 So. 2d at 803.

"[T]o prove attempted armed robbery, the State must show: (1) the formation of an intent to commit the crime of robbery; (2) the commission of some physical act in furtherance of the robbery; and (3) the use of a firearm." Franqui v. State, 699 So. 2d 1312, 1317 (Fla. 1997). "The overt act necessary to fulfill the requirements of attempted robbery . . . must be adapted to effect the intent to commit the crime; it must be carried beyond mere preparation, but it must fall short of executing the ultimate design." Mercer v. State, 347 So. 2d 733, 734 (Fla. 4th DCA 1977) (citing Gustine v. State, 86 Fla. 24, 97 So. 207 (1923)).

The intent to commit an armed robbery must be supported by "competent, substantial evidence from which the [finder of fact] could infer the defendant's intent to deprive the victim of property." Grant v. State, 138 So. 3d 1079, 1084 (Fla. 4th DCA 2014) (quoting Fournier v. State, 827 So. 2d 399, 401 (Fla. 2d DCA 2002)). Such intent "may be proved by considering the conduct of the accused . . . before, during, and after the alleged attempt along with any other relevant

- 36 -

circumstances." Franqui, 699 So. 2d at 1317 (citing Cooper v. Wainwright, 308 So. 2d 182, 185 (Fla. 4th DCA 1975)).

Davis's intent to commit armed robbery is supported by competent, substantial evidence of his conduct before, during, and after the attempt. Before the attempted robbery, indeed, on the very same day, Davis purchased a .357 magnum revolver from his cousin. That evening, when he arrived in the vicinity of the BP, Davis parked his car off site in a secluded area. In doing so, he backed his car up to a gate and hid the license plate from view. Moreover, to shield his identity, Davis dressed in dark clothes and donned a hood and a face mask.

Additionally, Davis's conduct during and immediately after the attempt indicates his intent to commit armed robbery. Davis approached the convenience store at night and at closing time. He pulled at the store door attempting to gain entry. Upon Prakashkumar's indication that the store was closed, Davis fired a gunshot through the window. His attempt was somehow distracted by Dashrath and Pravinkumar, because Davis quickly ran in their direction. However, after Davis shot both men, he ran back to the store and pulled at the door again. Then, after unsuccessfully trying again to gain access to the store, Davis ran away and left the scene.

Additional relevant circumstances are strong indicators of Davis's motive to commit robbery. Through multiple witnesses, the State presented evidence that

Davis was suffering from financial difficulty.  Davis was delinquent on his

mortgage, was no longer working, and was supporting his wife, who was on a

leave of absence from work due to pregnancy complications.  Davis was no longer

gainfully employed.  His car was parked in the garage because he could not afford

the insurance payments, and he and his wife shared the black Nissan Altima.  They

also terminated their cell phone service because they could not afford the expense.

Consequently, Davis's conduct surrounding the attempted armed robbery

and relevant circumstances of his significant financial difficulty constitute

competent, substantial evidence of his intent to commit robbery.  We therefore

affirm the trial court's finding that the murders were committed during the course

of an attempted armed robbery.

## VIII.  Dying Declaration

Davis argues that the trial court erred in admitting—during the BP trial—the

dying declaration of Headley victim Yvonne Bustamante.[4]  On the day of the

Headley crimes, responding officer Lt. Elrod questioned Bustamante at the scene.

When asked about what had taken place at Headley, Bustamante made statements

describing the events.  Among these statements, she identified Davis as the

_____

4. Davis also raised the issue of Bustamante's dying declaration in the direct
appeal of his Headley convictions.  See Davis v. State, No. SC11-1122 (Fla. Nov.
10, 2016).  Davis raises similar issues relating to Bustamante's dying declaration in
this case.

perpetrator and also indicated that Davis was a former Headley customer. Davis sought to exclude Bustamante's statements from the Headley trial, and the trial court held an extensive evidentiary hearing to determine their admissibility. Following the hearing, the trial court held that Bustamante's statements were admissible in their entirety under the dying declaration hearsay exception.

Because the same gun that was used in the BP murders of Dashrath and Pravinkumar was used to shoot Bustamante during the events at Headley, the State sought to introduce—during the BP trial—Bustamante's statements identifying Davis as the person who shot her. Before the BP trial, the court conducted an independent review of the evidentiary hearing testimony and concluded that Bustamante's statements would be admissible in that trial as a dying declaration. However, the trial court sharply limited the extent to which her statements would be admissible. To that end, as discussed in Issue I, Lt. Elrod and other witnesses testified regarding Bustamante's identification of Davis as the person who shot her, and Bustamante's identification of Davis based on her personal knowledge of him. We have already concluded that the trial court did not err in admitting Bustamante's statements in this limited manner.

In the present issue, Davis maintains that Bustamante's statements were improperly admitted under the dying declaration hearsay exception, and he raises two points. First, he urges this Court to hold that as a matter of law, the dying

declaration is no longer a valid hearsay exception in Florida. Davis argues that the dying declaration is not an exception to the United States Supreme Court's holding in Crawford v. Washington, 541 U.S. 36, 68 (2004) (holding that the admission of a testimonial statement violates a defendant's Sixth Amendment right to confrontation where the declarant is unavailable and the defendant lacked a prior opportunity to cross-examine the declarant). Second, Davis argues that even if the dying declaration survived Crawford, Bustamante's statements did not constitute a valid dying declaration because Bustamante did not have a fear of impending death. As we explain below, we reject both arguments.[5]

## A. Bustamante's Dying Declaration

We now set forth an overview of the circumstances under which Bustamante made her statements at the Headley scene. As we discuss this issue, we emphasize that evidence relating to the Headley robbery and fire and Bustamante's burn injuries is only relevant to determine whether Bustamante's statements constituted a valid dying declaration. This evidence is necessary to evaluate the totality of the circumstances under which Bustamante's statements were made.

---

5. Davis also contends that the trial court erroneously admitted Bustamante's statements under the forfeiture by wrongdoing exception. This argument is without merit. The trial court expressly concluded that Bustamante's statements were admissible as a dying declaration. We therefore reject this argument without further discussion.

At the evidentiary hearing held before the Headley trial, Lt. Elrod testified that when he first approached Bustamante, he observed a badly burned woman lying on a gurney who appeared to be burned over about eighty percent of her body. Lt. Elrod quickly surmised that Bustamante would not survive her injuries. As a result, he began to ask Bustamante pointed questions for the purpose of obtaining her statement. Lt. Elrod testified as follows:

Lt. Elrod:    At that point, I knew she wasn't going to survive the burns.

State:    Did that affect the way that you then began to handle your responsibilities as the first Lake Wales officer to have contact with her?

Lt. Elrod:    Yes, sir.

State:    What—what did you do? Why did you do it?

Lt. Elrod:    I wanted to get her statement before it wouldn't ever be gotten.

State:    Now, normally, if you were the first officer on the scene, someone is being treated by medical personnel, would you just go ahead and start asking them questions if you thought they were going to survive and be in the hospital?

Lt. Elrod:    No, sir. I would have let the medical people try to take care of them.

State:    But in this case, did you go ahead and begin to actually speak with the woman on the gurney and ask her very pointed questions?

Lt. Elrod:    Yes, sir.

- 41 -

When Lt. Elrod asked Bustamante what happened, Bustamante explained that she and Luciano were working when Davis entered their office, demanded money from them, and tried to rob them. She said that when they did not give Davis the money that he wanted, he threw gasoline on them and set them on fire. Lt. Elrod asked her if she knew the perpetrator's identity. Bustamante told him, "yes, it was Leon Davis," and that he was a client of their insurance business. Bustamante appeared coherent and alert, and she spoke clearly in response to Lt. Elrod's questions.

Other witnesses at the evidentiary hearing also testified that they heard Bustamante describe the events at Headley and identify Davis. Additionally, medical personnel testified about Bustamante's grave physical condition, and eyewitness Fran Murray testified that Bustamante stated that she was going to die. Based on this testimony, the Headley and BP trial courts concluded that Bustamante's statements constituted a dying declaration. We now turn to Davis's argument that the trial court erred when it admitted as a dying declaration Bustamante's statements during the BP trial. We begin with Davis's argument that the dying declaration did not survive the United States Supreme Court's decision in Crawford.

## B.  The Dying Declaration and <u>Crawford</u>

Ratified in 1791, the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"  U.S. Const. amend. VI.  This protection extends to prosecutions in both federal and state courts.  <u>See</u> <u>Pointer v. Texas</u>, 380 U.S. 400, 406 (1965).  "Indeed, [the United States Supreme Court] ha[s] expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law."  <u>Id.</u> at 405.  However, "the [Confrontation] Clause permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial."  <u>Maryland v. Craig</u>, 497 U.S. 836, 847-48 (1990).  One example where such a necessity may arise is in the context of the admission of a declarant's dying declaration.

The admissibility of the dying declaration was recognized at common law on the grounds that such declarations are "made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth; a situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice."  <u>King v. Woodcock</u>, 1 Leach 500, 502, 168

- 43 -

Eng. Rep. 352, 353 (K.B. 1789). More than a century ago, the United States Supreme Court recognized that "from time immemorial [dying declarations] have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility. They are admitted, not in conformity with any general rule regarding the admission of testimony, but as an exception to such rules, simply from the necessities of the case, and to prevent a manifest failure of justice." Mattox v. U.S., 156 U.S. 237, 243-44 (1895). "[The dying declaration] exception was well established before the adoption of the constitution, and was not intended to be abrogated. The ground upon which such exception rests is that, from the circumstances under which dying declarations are made, they are equivalent to the evidence of a living witness upon oath[.]" Kirby v. U.S., 174 U.S. 47, 61 (1899).

Similarly, Florida has long recognized the dying declaration as a valid exception to the rule against hearsay:

> Dying declarations in cases of homicide form an exception to the rule against the admissibility of hearsay evidence. The law regards the declarant, when in the presence of imminent and inevitable death, as being under as solemn an inspiration to tell the truth as though he were pledged thereto by oath. To render such declaration admissible, however, the court must be satisfied that the deceased declarant, at the time of their utterance, knew that his death was imminent and inevitable, and that he entertained no hope whatever of recovery. This absence of all hope of recovery, and appreciation by the declarant of his speedy and inevitable death, are a preliminary foundation that must always be laid to make such declarations admissible.

Lester v. State, 20 So. 232, 233 (Fla. 1896).

However, Davis argues that in light of the United States Supreme Court's 2004 decision in Crawford, the admission of a testimonial dying declaration violates the Sixth Amendment right of confrontation. This Court has previously recognized that in Crawford, the Supreme Court "held that the introduction of a hearsay statement will result in a violation of the defendant's Sixth Amendment right to confrontation if (1) the statement is testimonial; (2) the declarant is unavailable; and (3) the defendant lacked a prior opportunity for cross-examination of the declarant." Hayward v. State, 24 So. 3d 17, 32 (Fla. 2009). In the present case, the State introduced, as a dying declaration, out-of-court testimonial statements of the declarant, Bustamante. Bustamante was unavailable to testify at trial, and Davis lacked a prior opportunity to cross-examine her. Thus, Davis argues that Bustamante's statements were inadmissible under the holding in Crawford.

To date, the United States Supreme Court has not answered whether the dying declaration exception remains viable in light of Crawford. Yet, in dicta, the Supreme Court has provided some guidance on the matter. Notably, in Crawford, although the facts of that case did not involve a dying declaration, the Court observed that dying declarations have been the "one deviation" to the rule excluding testimonial hearsay in criminal cases:

The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. . . . Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. . . . We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is <u>sui</u> <u>generis</u>.

<u>Crawford</u>, 541 U.S. at 56 n.6 (internal citations omitted). Subsequently, in <u>Giles v. California</u>, 554 U.S. 353, 358 (2008), the Supreme Court stated: "We have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted. The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying." Courts that have confronted the post-<u>Crawford</u> viability of the dying declaration have generally interpreted these statements as strong suggestions by the United States Supreme Court that the dying declaration exception does not run afoul of the Sixth Amendment right of confrontation.[6] Davis now calls upon

---

6. <u>See, e.g.</u>, <u>People v. Monterroso</u>, 101 P.3d 956, 972 (Cal. 2004) (concluding that "the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment."); <u>Walton v. State</u>, 603 S.E.2d 263, 265-66 (Ga. 2004) (recognizing that <u>Crawford</u> did not extend its holding to dying declarations); <u>People v. Gilmore</u>, 828 N.E.2d 293, 302 (Ill. App. Ct. 2005) (concluding "that the [United States Supreme] Court does not believe that admitting testimonial dying declarations violates the confrontation clause."); <u>Wallace v. State</u>, 836 N.E.2d 985, 993-96 (Ind. Ct. App. 2005) (rejecting appellant's argument that the dying declaration offends an accused's right to confrontation); <u>State v. Jones</u>, 197 P.3d 815, 821-22 (Kan. 2008) (concluding that "the [United States] Supreme Court would confirm that a dying declaration may be admitted into evidence, even when it is testimonial in nature and is

this Court to determine whether Florida's dying declaration exception remains viable post-Crawford.

## Majority View vs. Minority View

Davis acknowledges that there is a split of authority on whether the dying declaration survived Crawford. However, Davis's position, that the exception is no longer viable, falls clearly within the minority. Nonetheless, Davis argues that Florida's dying declaration exception is inconsistent with the dying declaration that existed at common law, and thus, it does not satisfy Crawford's historical grounds exception. Davis also contends that the dying declaration is not a valid hearsay exception because dying declarations are inherently unreliable. Today, Davis's

---

unconfronted."); Commonwealth v. Nesbitt, 892 N.E.2d 299, 310-11 (Mass. 2008) (recognizing Crawford's acknowledgment of the dying declaration as an exception under the Sixth Amendment right of confrontation); State v. Martin, 695 N.W.2d 578, 585-86 (Minn. 2005), abrogated on other grounds by State v. Moua Her, 750 N.W.2d 258, 265 n.5 (Minn. 2008) (holding "that the admission into evidence of a dying declaration does not violate a defendant's Sixth Amendment right to confrontation within the meaning of Crawford because an exception for dying declarations existed at common law and was not repudiated by the Sixth Amendment."); Harkins v. State, 143 P.3d 706, 710-11 (Nev. 2006) (holding that the dying declaration is an exception to the Confrontation Clause); State v. Calhoun, 657 S.E.2d 424, 426-28 (N.C. 2008) (holding that dying declarations do not violate the Sixth Amendment); State v. Lewis, 235 S.W.3d 136, 147-48 (Tenn. 2007) (holding "that this single hearsay exception survives the mandate of Crawford regardless of its testimonial nature"); State v. Beauchamp, 796 N.W.2d 780, 795 (Wis. 2011) (concluding that "a hearsay exception as long-standing, well-established and still necessary as [the dying declaration], . . . cannot lightly be dismissed.").

- 47 -

arguments notwithstanding, this Court joins the overwhelming majority view that the dying declaration exception remains viable post-Crawford. The unique nature and purpose of the dying declaration exception, observed in Crawford and Giles, justifies its continuing utility and validity as an exception to the rule against hearsay. We therefore reaffirm the continued use of the dying declaration in this state in a manner that is consistent with the applicable law that defines the exception.

## Historical Grounds

Davis argues that Florida's dying declaration exception is no longer valid because the modern exception has evolved from that which existed at common law. Davis asserts that at common law, the justification for admitting a declarant's dying declaration was the declarant's religious belief in the afterlife, and he maintains that in contrast to a justification based on the declarant's religious belief, Florida's existing dying declaration exception is secular and nondenominational. See § 90.804(2)(b), Fla. Stat. (requiring an unavailable declarant's reasonable belief "that his or her death was imminent, concerning the physical cause or instrumentalities of what the declarant believed to be impending death or the circumstances surrounding impending death."). Consequently, Davis argues, Crawford's "historical grounds" for Florida's dying declaration exception can no

longer be used to justify the admission of a dying declaration in Florida's courts. See Crawford, 541 U.S. at 56 n.6.

It is true that "[t]he [dying declaration] hearsay exception has sometimes been justified on the grounds that a dying person was presumed under the common law to have, due to commonly held religious beliefs concerning the afterlife, such a fear of dying without the opportunity to expiate a lie that the reliability of any statement made in those circumstances was deemed equivalent to that of sworn testimony." State v. Beauchamp, 796 N.W.2d 780, 794 (Wis. 2011). Thus, Davis argues that Florida's dying declaration exception does not fall under the "historical grounds" suggested in Crawford, because it lacks the religious justification that existed at common law. See Crawford, 541 U.S. at 56 n.6.

Davis cites two federal district court opinions which concluded that dying declarations are not an exception to the confrontation clause. In U.S. v. Mayhew, 380 F. Supp. 2d 961, 966 (S.D. Ohio 2005), a federal district court expressly "reject[ed] the government's argument that dying declarations are an exception to the Confrontation Clause." Id. at 965. In U.S. v. Jordan, No. 04-CR-229-B, 2005 WL 513501 (D. Colo. Mar. 3, 2005), an unpublished memorandum and order, the federal district court suggested that historical underpinnings do not continue to justify the dying declaration. The court concluded that "there is no rationale in Crawford or otherwise under which dying declarations should be treated

- 49 -

differently than any other testimonial statement. This is so especially since the historical underpinnings of the exception fail to justify it." Id. at *3.

However, the religious justification as the sole or primary justification of the dying declaration has not been universally accepted. In 1860, Wigmore on Evidence included the following analysis:

> [A dying declaration] is not received upon any other ground than that of necessity, in order to prevent murder going unpunished. What is said in the books about the situation of the declarant, he being virtually under the most solemn sanction to speak the truth, is far from presenting the true ground of the admission. . . . [T]he rule is no doubt based upon the presumption that in the majority of cases there will be no other equally satisfactory proof of the same facts. This presumption and the consequent probability of the crime going unpunished is unquestionably the chief ground of this exception in the law of evidence.

Wigmore on Evidence, § 1431 (quoting 1 Greenleaf, Evidence § 156, editorial note (1860) (emphasis added)). "It is scarcely necessary to say that, to the rule that an accused is entitled to be confronted with witnesses against him, the admission of dying declarations is an exception which arises from the necessity of the cause." Kirby, 174 U.S. at 61. A declarant's religious belief notwithstanding, the dying declaration exception recognizes the extraordinary nature of the dying person's ability to speak to the circumstances that placed her in that grave position, and quite possibly to identify the perpetrator and ensure that the one who commits murder is held accountable. As such, we reject Davis's argument.

<u>Reliability of the Dying Declaration</u>

Davis also suggests that dying declarations are inherently unreliable. In <u>Mayhew</u>, the court suggested that a dying person might have an incentive to offer false dying statements:

> For example, the declarant might have been in a revengeful state of mind which would color his dying statements. No longer subject to the fear of retaliation by his enemies, the declarant might falsely incriminate those persons whom he disliked. If the decedent had no religious belief or fear of punishment after death, the statements made while dying would seem to lose much of the trustworthiness traditionally attributed to them. In general, self-serving declarations would be particularly suspect, for the decedent could thereby exculpate himself from questionable association with the circumstances surrounding his death. The declarant's physical and mental state of mind at the moment of death may weaken the reliability of his statements.

380 F. Supp. 2d at 965 n.5 (quoting <u>Note, Affidavits, Depositions, and Prior Testimony</u>, 46 Iowa L. R. 356, 375-76 (1961)).

While not impossible, we do think it improbable that a dying person would use the fleeting moments of her earthly existence to, rather than place blame at the feet of her actual murderer, intentionally falsely incriminate someone else. After all, "[t]he admission of the [dying declaration] is justified upon the ground of necessity, and in view of the consideration that the certain expectation of almost immediate death will remove all temptation to falsehood and enforce as strict adherence to the truth as the obligation of an oath could impose." <u>Mattox</u>, 146

U.S. at 152. Consequently, we reject Davis's challenge to the reliability of the dying declaration.

Having concluded that Davis's arguments are without merit, we reject his invitation to abrogate Florida's dying declaration exception. Our analysis and the conclusion that we reach today are consistent with that of other jurisdictions that have considered the post-Crawford viability of the dying declaration. For instance, shortly after Crawford was decided, the California Supreme Court decided People v. Monterroso, 101 P.3d 956 (2004). In Monterroso, the court rejected the defendant's claim "that Crawford has abrogated the exception for dying declarations." Id. at 972. Concluding that "the holding of Crawford does no such thing," the court observed:

> To exclude such evidence as violative of the right to confrontation "would not only be contrary to all the precedents in England and here, acquiesced in long since the adoption of these constitutional provisions, but it would be abhorrent to that sense of justice and regard for individual security and public safety which its exclusion in some cases would inevitably set at naught."

Monterroso, 101 P.3d at 972 (quoting State v. Houser, 26 Mo. 431, 438 (Mo. 1858)). The court concluded: "it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment." Id. (citations omitted).

The Supreme Court of Wisconsin upheld the post-Crawford viability of the dying declaration in Beauchamp, 796 N.W.2d at 791, reasoning: "If we were to

accept that the Confrontation Clause, as set forth in Crawford's seemingly unbending declaration, requires that all testimonial statements be subject to confrontation to test their reliability, we would exclude dying declarations as, by definition, unconfrontable, and therefore, statements whose reliability cannot be tested." We agree with the court in Beauchamp that "such a seemingly rigid approach cannot prevail here." Id.

Most recently, the highest appellate court in Maryland, the Special Court of Appeals, held that the dying declaration remains viable in Maryland. The state's high court explained:

> Here, we reach the same conclusion that the Supreme Court has consistently endorsed for more than a century, and hold that the Confrontation Clause does not apply to dying declarations. . . . Although it is accurate that, in Crawford and its progeny, the Supreme Court has not yet held that the Confrontation Clause does not apply to dying declarations, our holding is entirely consistent with Crawford and its progeny.

Hailes v. State, 113 A.3d 608, 611 (Md. 2015).

Although Crawford "deliberately avoided the question of how [the holding in Crawford] would apply in a dying declaration case," we are persuaded that the United States Supreme Court has nonetheless "made clear that notwithstanding the categorical language employed in Crawford, there remain situations in which a defendant may not successfully invoke the Confrontation Clause to exclude testimonial hearsay statements." Beauchamp, 796 N.W.2d at 791. The

introduction of a valid dying declaration is such a situation. Thus, we reject Davis's urging to abrogate the dying declaration exception, and we join the majority of courts that have considered the post-Crawford viability of the dying declaration and have concluded that the dying declaration did survive Crawford.

**C. Whether Bustamante's Statements Qualify as a Dying Declaration**

In light of our holding that Crawford did not abrogate the dying declaration exception in Florida, we now turn to whether Bustamante's statements constituted a dying declaration. Davis argues that Bustamante did not believe that her death was imminent, and thus, her statements were inadmissible as a dying declaration.

As we have already observed, the trial court properly limited the scope of the Headley evidence that was admissible during the guilt phase of the BP trial. Evidence relating to the Headley robbery and fire and the victims being set on fire was properly excluded during the guilt phase. However, this excluded evidence is relevant to a determination of whether Bustamante's statements constituted a dying declaration. We reiterate that while such evidence was relevant to the admissibility of Bustamante's statements under the dying declaration exception, it was not introduced during the guilt phase of the BP trial. We review such evidence here for the sole purpose of evaluating the totality of the circumstances surrounding Bustamante's statements and the propriety of the trial court's decision to admit even a limited scope of her statements as a dying declaration.

"In considering a trial court's ruling on admissibility of evidence over an objection based on the Confrontation Clause, [this Court's] standard of review is de novo." McWatters v. State, 36 So. 3d 613, 637 (Fla. 2010) (quoting Milton v. State, 993 So. 2d 1047, 1048 (Fla. 1st DCA 2008)). In order for the dying declaration exception to apply, "the deceased must have known and 'appreciated his condition as being that of an approach to certain and immediate death,' although it is not necessary that the declarant 'make express utterances' that he would never recover." Hayward, 24 So. 3d at 30 (quoting Henry v. State, 613 So. 2d 429, 431 (Fla. 1992)). In determining whether to admit hearsay as a dying declaration, " 'the court should satisfy itself, on the totality of the circumstances,' that the deceased knew he was dying." Id. at 30-31 (quoting Henry, 613 So. 2d at 431). The "absence of all hope of recovery, and appreciation by the declarant of his speedy and inevitable death, are a preliminary foundation that must always be laid to make such declarations admissible." Id. at 31 (quoting McRane v. State, 194 So. 632, 636 (1940)). Based on the totality of the circumstances, the trial court did not err in admitting Bustamante's dying declaration.

Before the Headley trial, the trial court held an extensive evidentiary hearing during which the State presented the testimony of witnesses who were in contact with Bustamante at the scene. One of these witnesses was Fran Murray, who testified as follows:

> She started talking about her kids. And she said she was in so much pain. She kept saying it over and over, and that her body hurt so bad, and that she knew that she wasn't going to make it. She said, please keep me in your prayers. I'm not going to make it.

Bustamante, who was oriented and alert at the scene, was aware of her extensively burned body. Witnesses testified that Bustamante received extensive burns of the second, third, and fourth degree, she was burned over at least eighty percent of her body, her flesh was falling off of her body, she was in severe pain, and the severity of her burns was indicative of a high probability of death.

While Bustamante's statement that "she wasn't going to make it" was certainly an important factor for the trial court's consideration, as we did in Hayward, we emphasize that a verbal acknowledgment of impending death is not required in order to find that a declarant's statement constitutes a dying declaration. The testimony of multiple witnesses revealed the dire circumstances that Bustamante faced after Davis set her body on fire.

Given the totality of the circumstances, Davis's assertion that Bustamante's statements were not properly admitted as a dying declaration is without merit. The trial court received a substantial amount of consistent witness testimony about Bustamante's condition. Moreover, Bustamante clearly expressed her belief that she was not going to survive. Thus, we conclude that the trial court properly admitted Bustamante's statements under the dying declaration exception, which remains a valid hearsay exception in this state.

- 56 -

## IX. Identifications by Greisman and Ortiz

Davis also argues that the pretrial and in-court identifications made by Headley eyewitnesses Greisman and Ortiz should not have been admitted during the BP trial. At separate times within days of the Headley shootings, Greisman (shooting victim) and Ortiz offered out-of-court identifications of Davis after viewing his photograph in a photopack (also known as a photographic lineup). Both men also identified Davis in court during their trial testimony. Davis argues that these identifications were unreliable and should have been excluded as evidence. Similar to Davis's claims relating to the admission of Bustamante's dying declaration, Davis also challenged the admissibility of Greisman's and Ortiz's identifications in the direct appeal of his convictions stemming from the events at Headley. See Davis v. State, No. SC11-1122 (Fla. Nov. 10, 2016). In Issue I in the present opinion, we concluded that the trial court did not err in admitting Greisman's and Ortiz's identifications during the guilt phase of the BP trial to the extent that they identified Davis as the Headley shooter. Thus, we now address Davis's claims that (1) the pretrial identifications of Davis were unnecessarily suggestive, and (2) the pretrial identifications rendered the in-court identifications inadmissible. As we explain below, we reject both claims. The circumstances surrounding each witness's identification are as follows.

Greisman testified that upon reaching the vicinity of the Headley building, he observed Davis walking towards him. Greisman saw Davis's face clearly and made eye contact with him. Greisman thought that Davis was responding to the events at Headley and that he intended to offer assistance. Instead, Davis shot him in the face. After being transported to the hospital, Greisman underwent surgery and remained in the hospital overnight. He was not allowed to watch television, and he denied seeing any newspaper or other media accounts during his hospital stay. When Greisman was released from the hospital, his mother drove him to the Lake Wales Police Department to speak to two detectives. While at the police station, Greisman viewed a photopack containing six photographs, one of which was a photograph of Davis. When asked if he recognized the person who shot him, Greisman quickly recognized Davis's photograph, and he placed his initials next to it. Greisman identified Davis again from the witness stand at trial.

Similarly, Ortiz identified Davis as the shooter and testified that he saw Davis's face clearly. After Greisman was shot, Ortiz looked Davis in the eyes and maintained his view of Davis because he was concerned that Davis would attack him. Four days after the events at Headley, Ortiz viewed a photopack containing Davis's photograph. Ortiz easily identified Davis as the perpetrator. In addition to Ortiz's observations of Davis at the time of the shooting, Ortiz testified that he

recognized Davis as someone whom he previously saw at the Florida Natural

Growers juice plant.  Ortiz previously worked at the plant.

## A.  Validity of the Out-of-Court Identifications/Photopacks

First, Davis contends that the photopacks shown to Greisman and Ortiz were

unnecessarily suggestive and that as a result, their out-of-court identifications of

Davis were invalid.  "This Court has adopted a two-part test to determine whether

an out-of-court identification may be admitted: First, whether police used an

unnecessarily suggestive procedure to obtain an out-of-court identification, and,

second, if so, considering all the circumstances, whether the suggestive procedure

gave rise to a substantial likelihood of irreparable misidentification."  Green v.

State, 641 So. 2d 391, 394 (Fla. 1994) (citing Grant v. State, 390 So. 2d 341, 343

(Fla. 1980)).  When evaluating the likelihood of misidentification, a court should

consider:

> the opportunity of the witness to view the criminal at the time of the
> crime, the witness' degree of attention, the accuracy of the witness'
> prior description of the criminal, the level of certainty demonstrated
> by the witness at the confrontation, and the length of time between the
> crime and the confrontation.

Rimmer v. State, 825 So. 2d 304, 316 (Fla. 2002) (quoting Grant, 390 So. 2d at

343).  However, where the procedure used to obtain the out-of-court identification

was not unnecessarily suggestive, the likelihood of irreparable misidentification

need not be explored.  See id.  In this case, the procedures used to obtain the out-

of-court identifications made by Greisman and Ortiz were not unnecessarily suggestive.

Greisman and Ortiz were each shown a photopack that was printed on a piece of letter-sized paper and contained six photographs. The photographs were divided into two rows, with three photographs in each row. The lower left corner of each photograph contained an identifying number ranging from one through six. Below the bottom row of photographs were six sets of book-in numbers, each of which corresponded to one of the photographs. Each of the numbers contained between seven and eleven digits and was printed in small font. Davis's book-in number contained the number 2007, and the other photographs each contained the number 93 or 94, representing the year that the photograph was taken. As a result, Davis argues that the placement of the number 2007 in his book-in number distinguished it from the other book-in numbers that contained the numbers 93 and 94, and unnecessarily suggested that his was the suspect's photograph. We disagree.

The photopack in this case is distinguishable from cases cited by Davis where a date was actually placed on the suspect's photograph. For instance, in Brown v. Commonwealth, 564 S.W.2d 24 (Ky. Ct. App. 1978), a case involving the appeal of two defendants' robbery convictions, the appellate court detailed the following facts:

The seven photographs shown Lineberry and Scott were mug shots from the files of the Jefferson County Police Department. In each photograph a board was suspended from around the neck of the individual. Each board contained information for identification purposes. In the case of Brown and Hill [the appellants], each board contained the abbreviation "ROB" and the date "November 17, 1975." In the other five photographs, the boards did not contain the robbery date of November 17, 1975, nor were any two dates the same. Only one of the other five photographs contained the abbreviation "ROB."

Id. at 26. These facts, which include the unequivocal use of the date of the crime and the abbreviation "ROB" within the suspects' photographs, demonstrate an unnecessarily suggestive photographic lineup.

In contrast, the photopacks shown to Greisman and Ortiz contained, beneath the entire set of photographs, six sets of book-in numbers that corresponded to the photographs above. The numbers were printed in small font and were innocuous. Both Greisman and Ortiz quickly identified Davis's photograph. Therefore, we reject Davis's argument that the book-in numbers rendered the photopacks unnecessarily suggestive. Consequently, the trial court did not err in admitting the out-of-court identifications made by Greisman and Ortiz.

## B. Validity of the In-Court Identifications

Second, Davis argues that the in-court identifications made by Greisman and Ortiz are invalid. He asserts that the in-court identifications were rendered unreliable by the earlier use of unnecessarily suggestive photopacks. However, because the photopacks were not unnecessarily suggestive and did not invalidate

Greisman's and Ortiz's out-of-court identifications, Davis's argument that the photopacks rendered their in-court identifications invalid is without merit. Davis is not entitled to relief.

### X. Weight Assigned to Aggravating and Mitigating Factors

Davis also challenges the weight assigned by the trial court to two mitigating circumstances, arguing that the trial court failed to individually weigh each on its own merits. Second, Davis argues that the court improperly weighed the aggravating circumstances. We address each claim in turn.

<u>Mitigating Circumstances</u>

First, Davis argues that the trial court improperly discounted two nonstatutory mitigating circumstances. "[A] defendant must raise a proposed nonstatutory mitigating circumstance before the trial court in order to challenge on appeal the trial court's decision about that nonstatutory mitigating factor." Davis v. State, 2 So. 3d 952, 962 (Fla. 2008) (citing Lucas v. State, 568 So. 2d 18, 23-24 (Fla. 1990)). Yet, when determining the appropriateness of a sentence of death, "trial courts are required to consider all mitigating evidence presented by the defendant and supported by the record." Griffin v. State, 820 So. 2d 906, 913 (Fla. 2002) (citing Walker v. State, 707 So. 2d 300, 318 (Fla. 1997)). Davis challenges the trial court's findings with respect to nonstatutory circumstances nine (stressors at the time of incident) and ten (good person in general):

## 9. Stressors at the time of incident.

It is obvious that the Defendant was under some financial stress in December 2007. By that time, he had lost his long term, good paying job at Florida Natural Growers and had gone to work for the City of Eagle Lake. However, he also lost that job and received his last paycheck from the City of Eagle Lake on December 6, 2007.

The Defendant's wife, Victoria Lynn Davis, was on a leave of absence from her job due to problems with her pregnancy. The family owed past due mortgage payments and had maxed out their credit cards. The Defendant did not have any significant amount of cash in the bank and was facing his son's upcoming birthday and the Christmas holidays.

His son . . . was born with [Down] syndrome, and the Defendant was actively participating in this upbringing. It is clear that he spent a lot of time with his son . . . .

The Court finds this mitigating circumstance has been proven by a greater weight of the evidence, but it does not justify a decision to rob a convenience store and murder two victims in the course of the attempted robbery.

The Court assigns this mitigator little weight.

## 10. Good person in general.

The evidence establishes that the Defendant, Leon Davis Jr., was a loving husband, who was devoted to his [Down] syndrome son . . . . He was also actively involved in his family, regularly seeing his brother and his sisters.

It appears that he was very well regarded by his entire family, his friends, and his employers.

The Court finds this mitigator has been proven by a greater weight of the evidence but, in light of the murders at Headley Insurance Agency, assigns it little weight.

- 63 -

(Emphasis added.)

When evaluating mitigating circumstances, "each mitigating circumstance is to be analyzed and weighed individually." Perez v. State, 919 So. 2d 347, 373-74 (Fla. 2005) (citing Peterka v. State, 640 So. 2d 59, 70 (Fla. 1994)). Furthermore, "the written findings chronicling the trial court's analysis and reasons for the weight assigned by it should be 'unmistakably clear' to ensure that a defendant is afforded a full appellate review in cases where the ultimate sentence is death." Id.

In this case, the trial court found as a nonstatutory mitigating circumstance that Davis was subject to stressors at the time of the BP murders but discounted the mitigation because it did not justify the BP attempted robbery and murders. The trial court's analysis was improper. Additionally, while the trial court found as a nonstatutory mitigating circumstance that Davis was a good person in general, the court assigned the mitigation little weight "in light of the murders at Headley Insurance Agency." Likewise, this analysis was improper. We addressed a similar issue in Perez, and we again "remind the trial court below that each mitigating circumstance is to be analyzed and weighed individually." Id. at 373.

While we conclude that the trial court erred when it discounted these nonstatutory mitigating circumstances based on other factors, in light of the weighty aggravating circumstances in this case, we conclude that the trial court's error is harmless.

## Aggravating Circumstances

In the conclusion of the sentencing order, the trial court said: "The State has proven, beyond and to the exclusion of all reasonable doubt, 3 Statutory Aggravators, to which the Court has assigned great weight." This language is inconsistent with the court's specific findings contained in the sentencing order: (1) capital felony committed by person previously convicted of a felony and on felony probation (moderate weight); (2) prior capital/violent felony conviction (very great weight); and (3) capital felony committed during the course of an attempted robbery (great weight).

The trial court did misstate the weight that it gave to two of the aggravating factors. However, while the court overstated the weight assigned to one aggravating circumstance (Davis was previously convicted of a felony and on felony probation), it understated the weight assigned to another (prior capital/violent felony). The sentencing order reflects a detailed consideration of each aggravating circumstance and acknowledges "that the process is not simply a quantitative analysis but a qualitative one." Having conducted its qualitative analysis, the trial court concluded that the aggravating circumstances outweighed the mitigating circumstances. Davis is not entitled to relief.

## XI. Proportionality

This Court is required to conduct "a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence." Offord v. State, 959 So. 2d 187, 191 (Fla. 2007) (quoting Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003)). "This entails 'a qualitative review . . . of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.' " Id. (quoting Urbin v. State, 714 So. 2d 411, 417 (Fla. 1998)). Thus, in determining whether a death sentence is proportionate, this Court does not simply compare the number of aggravating circumstances versus the number of mitigating circumstances. See id.

In this case, involving the murders of two victims, the trial court found the following aggravating circumstances: (1) capital felony committed by person convicted of a felony and on felony probation (moderate weight); (2) prior capital/violent felony conviction (very great weight); and (3) capital felony committed during the course of an attempted robbery (great weight). The court found as a statutory mitigating circumstance that Davis was under the influence of extreme mental or emotional distress and assigned it little weight. The trial court also found multiple nonstatutory mitigating circumstances; the weightiest of these, related to abuse and bullying in his childhood, and his role as a good father, son,

- 66 -

and brother, were afforded moderate weight.  Ultimately, the trial court concluded that the aggravating circumstances justified the imposition of the death penalty and that the mitigating circumstances were insufficient to overcome the weighty aggravation.

Davis's case is proportionate to cases involving shooting deaths where this Court has upheld the appellant's sentence of death.  In Sanchez-Torres v. State, 130 So. 3d 661, 674-76 (Fla. 2013), this Court upheld the death sentence where the trial court found two aggravating circumstances, including prior violent felony, and weighed the aggravating circumstances against "numerous nonstatutory mitigators."  Likewise, in Hayward, this Court upheld the death sentence as proportionate where the trial court found two aggravating circumstances, including prior violent felony, and weighed these aggravating circumstances against several nonstatutory mitigating circumstances.  Hayward, 24 So. 3d at 46.  See also McMillian v. State, 94 So. 3d 572 (Fla. 2012) (death sentence upheld where trial court weighed two aggravating circumstances, including prior violent felony, against several nonstatutory mitigating circumstances); Lebron v. State, 982 So. 2d 649 (Fla. 2008) (death sentence for shooting murder upheld where trial court weighed two aggravating circumstances, including prior violent felony, against several nonstatutory mitigating circumstances).

Moreover, Davis's case is also proportionate to other cases involving double murders. See Marquardt v. State, 156 So. 3d 464 (Fla.) (death sentence upheld where the trial court weighed four aggravating circumstances as to one victim and three as to the second victim, including prior violent felony, against two statutory mitigating circumstances and two nonstatutory mitigating circumstances), cert. denied, 136 S. Ct. 213 (2015).

Davis argues that his death sentence is disproportionate because the trial court did not find that the murders were especially heinous, atrocious, or cruel (HAC), or that the murders were cold, calculated, and premeditated (CCP). While the absence of HAC or CCP alone does not render a death sentence disproportionate, this Court has stated that "while their absence is not controlling, it is also not without some relevance to a proportionality analysis." Larkins v. State, 739 So. 2d 90, 95 (Fla. 1999).

In this case, although HAC and CCP are not present, we are especially mindful of the extremely weighty aggravating circumstance properly found by the trial court based on Davis's prior capital felony convictions. The prior capital/violent felony aggravating circumstance, to which the trial court assigned the greatest weight, involved the brutal murders of Bustamante and Luciano— murders that occurred within one week of the BP murders. Like HAC and CCP, this Court has observed that the prior violent felony aggravating circumstance is

"among the weightiest aggravators set out in the statutory sentencing scheme." Hodges v. State, 55 So. 3d 515, 542 (Fla. 2010).

Also without merit is Davis's argument that his sentence is disproportionate because the murders that served as the basis for the prior capital/violent felony aggravating circumstance occurred one week after the BP murders. This Court has stated that "previous violent felony convictions suffice for purposes of the prior violent felony aggravator so long as the convictions predate the sentencing, even when the crimes underlying the conviction occurred after the crime for which the defendant is being sentenced." Knight v. State, 746 So. 2d 423, 434 (Fla. 1998) (citing Elledge v. State, 346 So. 2d 998 (Fla. 1977)). Davis was convicted of the murders of Bustamante and Luciano before he was sentenced to death for the murders of Dashrath and Pravinkumar. Davis is not entitled to relief on this ground. We therefore affirm on the ground of proportionality.

## XII. Ring/Hurst v. Florida Claim

Davis's final argument is that Florida's capital sentencing scheme is unconstitutional and violates the requirements set forth in Ring v. Arizona, 536 U.S. 584 (2002), because it relies on the trial court as the fact finder for an aggravating circumstance and does not require a unanimous jury finding. Davis preserved this argument before he waived his right to trial by jury. While Davis's appeal was pending, the United States Supreme Court issued Hurst v. Florida, 136

S. Ct. 616, 621 (2016) (Hurst v. Florida), in which it held that Florida's capital sentencing scheme violated the Sixth Amendment under Ring. The Supreme Court concluded that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." Id. at 619. Davis filed a notice of supplemental authority stating that he intended to rely upon Hurst v. Florida in support of his Ring claim. On July 26, 2016, we granted Davis's "Motion for Supplemental Briefing Regarding the Application of Hurst v. Florida to This Case."

In Mullens v. State, 197 So. 3d 16, 38 (Fla. 2016), we held that a defendant who has waived the right to a penalty phase jury is not entitled to relief under Hurst v. Florida. We concluded that a defendant "cannot subvert the right to jury factfinding by waiving that right and then suggesting that a subsequent development in the law has fundamentally undermined his sentence." Id. at 40. See also Brant v. State, 197 So. 3d 1051, 1079 (Fla. 2016) (relying upon Mullens to deny relief under Hurst v. Florida in the postconviction context). We have considered the arguments presented in the supplemental briefing, and based upon our reasoning in Mullens, we reject Davis's Ring/Hurst v. Florida claim.

## CONCLUSION

For these reasons, we affirm Davis's convictions and his sentences of death. It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Polk County,
    Donald G. Jacobsen, Judge - Case No. 532007CF00961301XXXX

Howard L. Dimmig, II, Public Defender, and Karen Mary Kinney, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Marilyn Muir Beccue, Assistant Attorney General, Tampa, Florida,

    for Appellee